R. Bruce Rich (RBR-0313)
Mark J. Fiore (MJF-5738)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email:      bruce.rich@weil.com
            mark.fiore@weil.com

*Attorneys for Plaintiff*
*HarperCollins Publishers LLC*



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

HARPERCOLLINS PUBLISHERS LLC,       )
                                    )
                    Plaintiff,      )
                                    )
        v.                          )
                                    )
OPEN ROAD INTEGRATED MEDIA, LLP,    )
                                    )
                    Defendant.      )
                                    )
---

11 CIV 9499

11 Civ. _____

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff HarperCollins Publishers LLC ("HarperCollins"), by and through its attorneys,

Weil, Gotshal & Manges LLP, for its Complaint against Open Road Integrated Media, LLP

("Open Road"), alleges, upon knowledge as to itself and otherwise upon information and belief,

as follows:

### NATURE OF THE ACTION

1.      By this action, HarperCollins, one of the world's leading English-language book

publishers, seeks damages and injunctive relief arising out of Open Road's willful infringement

of HarperCollins' rights under federal copyright law.  HarperCollins is entitled to the relief

sought herein because HarperCollins' agreement with author Jean Craighead George ("George"), among other pertinent provisions, grants HarperCollins the exclusive right to publish George's children's novel *Julie of the Wolves* (herein sometimes "the Work") "in book form," including explicitly via "computer, computer-stored, mechanical or other electronic means now known or hereafter invented."

2.      Notwithstanding the foregoing grant of rights, without authorization from HarperCollins, Open Road, a digital publisher that seeks illicitly to capitalize on HarperCollins' four decades of publication and promotion of *Julie of the Wolves*, has begun publishing an electronic version of that book (an "e-book"). In furtherance of its infringing activities, Open Road has copied into electronic format the complete text of *Julie of the Wolves* and distributed this text in electronic format to various websites for sale to the public, including Amazon.com, Apple, BN.com, Kobo Books, and Sony Reader Store.

3.      That Open Road seeks to publish *Julie of the Wolves* in electronic format – as opposed to paper format – fails to legitimize its conduct. The rights that HarperCollins acquired from George plainly encompass such electronic means of distribution, which is but a technology-enabled variant for how consumers can read the Work. Open Road's unlawful exploitation of those rights is directly competitive with sales of the Work in paper format and HarperCollins' own plans to publish *Julie of the Wolves* as an e-book. Open Road is understandably content to allow HarperCollins to have made its considerable investments in the Work, only now to reap where Open Road has not sown by seeking to divert sales of the Work from HarperCollins in the rapidly expanding e-books market. This fundamental impairment of rights ensured to HarperCollins by contract and copyright law should be enjoined and Open Road's unlawfully gotten gains therefrom disgorged.

## THE PARTIES

4.     Plaintiff HarperCollins is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 10 East 53rd Street, New York, New York.  HarperCollins is one of the world's leading English-language book publishers.  Its authors include luminaries such as Mark Twain, the Brontë sisters (Charlotte, Emily, and Anne), Charles Dickens, John F. Kennedy, Martin Luther King, Jr., and Shel Silverstein.  HarperCollins was founded in New York by James and John Harper nearly 200 hundred years ago, as J. and J. Harper, later Harper & Brothers.  In 1987, as Harper & Row, Publishers, Inc., it was acquired by News Corporation, and in 1990, it became HarperCollins following News Corporation's acquisition of British publisher William Collins & Sons.  Today, through itself and its affiliates, HarperCollins maintains publishing groups in the United States, Canada, the United Kingdom, Australia/New Zealand, and India.  Books published by HarperCollins have won numerous awards, including the Nobel Prize, Pulitzer Prize, National Book Award, Newbery Medal, and Caldecott Medal.  Consistently at the forefront of innovation and technological advancement, HarperCollins was one of the first publishers to digitize its content and create a global digital warehouse of that content.

5.     Defendant Open Road is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 180 Varick Street, Room 816, New York, New York.  Open Road was formed in 2009 and operates as a digital publisher and multimedia content company.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1338.

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c).
Open Road resides and transacts business in the State of New York, and the activities
complained of were carried on within this district.

## BACKGROUND

**HarperCollins' Publishing Activities**

8.     As a book publisher, HarperCollins' basic function is to present its authors' works
to the reading public by whatever means meet marketplace demand.  Through the years, these
means have evolved to include hardcover, trade paperback, and mass market paperback editions,
audio editions, and more recently electronic or "e-book" formats.  In return for grants from
authors of the right to publish for the duration of the works' copyright terms, HarperCollins has
made significant investments with respect to each publication format, always with the goal of
maximizing potential readership, for the benefit of the public in general and its contracting
authors in particular.  A major focus of such investment in recent years has been with respect to
e-books, a format that provides readers with the ability to read the identical works via electronic
means (versus in paper format) and with the convenience of downloading them to electronic
devices (whether computers, iPads, e-book readers such as the Kindle and Nook, or the like),
instead of purchasing physical copies at bookstores and other retail establishments.

9.     HarperCollins' publishing rights derive from contracts with its authors.  These
contracts routinely provide HarperCollins rights sufficient to enable it to copy and distribute the
works in whatever form and manner stimulate the purchase and readership of the works.  In
return, contracting authors are paid royalties keyed to sales of the works.  These royalties are

customarily accompanied by an advance against future royalty earnings, which the author keeps regardless of the sales success of the author's work.

10.    HarperCollins makes substantial expenditures in the works that it publishes.  It employs more than 750 editors and other publishing professionals in New York, who play an active role in every facet of the publishing process – from evaluating book proposals' publishing merit and extensive editing of manuscripts, through cover layout, print design, and distribution to thousands of brick-and-mortar and online retail outlets.  It is not unusual for one or more editors to work actively on a given project over a series of months or even years prior to publication.

11.    Once a work is published, HarperCollins makes further substantial expenditures to market the work and secure widespread distribution.  During fiscal year 2011 (ending in June 2011), HarperCollins spent more than $70 million in promoting its works.  These promotional activities encompassed, among others: trade and consumer advertising; distribution of review and promotional copies of the works to members of the media and influential readers; in-store displays; author tours and readings; and postings on websites.  HarperCollins also employs several sales forces to call on bookstores and other retail outlets as well as wholesalers to solicit orders.

12.    Due in significant part to the foregoing range of activities, authors and books published by HarperCollins, including *Julie of the Wolves*, have achieved critical acclaim and significant commercial success.  These efforts, and this success, have given HarperCollins and its various imprints an outstanding overall reputation and earned them enormous goodwill with authors, literary agents, booksellers, and the reading public.  During fiscal year 2011, HarperCollins had 166 titles on The New York Times Bestseller List, with 18 titles reaching the number one position.

**The Development Of E-Books**

13.     As the name implies, an e-book is simply a book presented via electronic means. Technically, an e-book consists of an electronic file that contains the text of an entire book formatted in a manner that allows the e-book to be read in a linear fashion on a computer, iPad, dedicated handheld e-book reader such as a Kindle or Nook, and similar devices.  These e-books contain the same text as their paper counterparts and are displayed for the reader in the same linear fashion, *i.e.*, the reader reads lines of text no differently than if the works were being read in hardcover or paperback.  The only real difference in the reading experience between e-books and their paper counterparts is that e-books display the copyrighted content on a computer or iPad screen or e-book reading device, rather than on paper.  Instead of physically turning the paper page, the e-book reader pushes a button or computer key to move to the next page of text. In some instances, the reader scrolls his or her finger across the screen of the reading device to cause the "page" of the e-book to turn, mimicking how a hardcover or paperback book functions.

14.     The concept of an e-book is a natural extension and outgrowth of technological developments that significantly predate HarperCollins' publishing agreement with George.  The e-book as it presently exists traces its lineage to the early methods of automated textual storage and retrieval, including microfilm and microfiche, developed as long as a century ago, as well as to the development of electronic document creation, storage, retrieval, and output mechanisms in the 1950s and 1960s.  Illustratively, in 1971, the year before *Julie of the Wolves* was published, what is often considered the first digital library – Project Gutenberg, a collection of the full electronic texts of books – was created.  While the commercial realization of the e-book is of more recent vintage, its conception from these roots has long been foreseeable.

15.     Today, e-books and e-book readers are omnipresent, and e-book sales compete directly with sales of books in paper formats.  According to the Association of American Publishers, e-books comprised more than eight percent of total consumer book sales in 2010.  In May 2011, Amazon.com announced that its e-book sales now exceed its printed book sales.

16.     HarperCollins has made significant investments toward making e-books a marketplace reality.  HarperCollins continues to expand its digital content and remains a global industry leader in the digital world.  HarperCollins has released more than 8,700 e-books, as well as more than 70 "applications" to the digital marketplace that facilitate ready consumer access to downloading and purchasing of e-books.

**HarperCollins' Licensing Agreement With Jean Craighead George**

17.     Jean Craighead George is the author of more than eighty books for children and young adults.  Her novel *Julie of the Wolves* was published in 1972 by HarperCollins, through its predecessor-in-interest Harper & Row, Publishers, Inc.  *Julie of the Wolves* won the Newbery Medal in 1973 for the most distinguished contribution to literature for children and was a nominee in the Children's Books category in the 1973 National Book Awards.  The Work was also named one of the best children's books of the past 100 years by Amazon.com and the Children's Literature Society.

18.     *Julie of the Wolves* is the story of a young girl, known as Miyax to her small Eskimo village and as Julie to her friend in San Francisco, who runs away when her life in the village becomes dangerous, only to find herself lost in the Alaskan wilderness.  Without food and with time running out, Miyax tries to survive by copying the ways of a pack of wolves.  Life in the wilderness proves to be a struggle, but when she finds her way back to civilization, Miyax is torn between her old and new lives – that of Miyax of the Eskimos or Julie of the wolves.

19.     Pursuant to an agreement dated July 1, 1971 (the "Agreement"), HarperCollins, through its predecessor-in-interest Harper & Row, Publishers, Inc., contracted with George to publish *Amaroq – Leader of the Wolves*, which name was subsequently changed to *Julie of the Wolves*.

20.     Among other rights conveyed, the Agreement (in paragraph 1) grants to HarperCollins, for the term of copyright, the exclusive English-language rights in the United States, its territories and possessions, and Canada to publish *Julie of the Wolves* "in book form." This grant is itself encompassing of the right to publish the Work as an e-book.  Paragraph 20 of the Agreement further makes clear that the scope of HarperCollins' publishing rights extends to exploitation of the Work "through computer, computer-stored, mechanical or other *electronic means now known or hereafter invented*" – language that serves only to reinforce HarperCollins' exclusive rights to publish the Work as an e-book.

21.     The stated limitation of paragraph 20 – that HarperCollins must seek George's consent to license rights in the Work enumerated in that paragraph – simply conditions HarperCollins' exercise of its exclusive rights in the limited circumstance in which, rather than itself commercially publishing and marketing the Work as an e-book, HarperCollins licenses a third party to do so.  Put another way, Paragraph 20 does not grant George or any third party the right to publish the Work as an e-book, a right that instead belongs exclusively to HarperCollins. The foregoing is made plain by paragraph 23 of the Agreement, which provides that "[i]t is understood and agreed that [HarperCollins] shall have the exclusive right to sell, lease or make other disposition of the subsidiary rights in which [it] has an interest under the terms of clause . . . 20."

22.     Pursuant to the Agreement, George received an advance against royalties to be earned for *Julie of the Wolves*.  HarperCollins also has paid, and continues to pay, substantial royalties beyond the advance based on the sales of *Julie of the Wolves*.  To date, HarperCollins has sold more than 3,800,000 units of *Julie of the Wolves* in all formats, including but not limited to hardcover and paperback formats.  HarperCollins continues to sell the Work in both of those formats.

23.     The United States Copyright Office granted a certificate of registration in the name of Jean Craighead George for *Julie of the Wolves* in 1972, which was renewed on November 20, 2000.  Copies of the certificate and renewal are annexed to this Complaint as Exhibit A.

24.     HarperCollins, an exclusive licensee of valid copyrights in *Julie of the Wolves*, is the beneficial owner of such valid copyrights.  The Agreement is governed by New York law.

**Open Road's Infringing Actions**

25.     Founded in 2009, Open Road is a digital publisher principally focused on publishing e-books.  According to its website, Open Road "partners with authors, estates, and their agents to digitize, design, distribute, and market their backlist books electronically."

26.     In late 2010, HarperCollins was advised by George's literary agent that George had received an offer from an unidentified publisher to publish *Julie of the Wolves* in e-book format.  HarperCollins responded that HarperCollins alone controlled the e-book publishing rights and evinced its intent, consistent with its rights under the Agreement, to pursue publishing *Julie of the Wolves* in e-book format itself.

27.     Thereafter, George's literary agent informed HarperCollins that, notwithstanding HarperCollins' rights under the Agreement, Open Road intended to publish *Julie of the Wolves* in e-book format.  Despite being advised by HarperCollins that proceeding with those plans would infringe upon HarperCollins' rights, in August 2011, Open Road publicly announced that, "[f]or the first time ever as ebooks, Open Road Integrated Media is releasing *Julie of the Wolves*, the classic story of a thirteen-year-old Eskimo girl who is protected by a wolf pack while lost on the Alaskan tundra."

28.     Open Road's conduct thereafter ripened into acts of copyright infringement.  To wit, Open Road has commercially exploited *Julie of the Wolves* by copying into electronic format the complete text of *Julie of the Wolves* and distributing this text in electronic format to various websites for sale to the public, including Amazon.com, Apple, BN.com, Kobo Books, and Sony Reader Store.

29.     Open Road's e-book edition of the Work is directly competitive with hardcover and paperback editions of the Work published by HarperCollins, as well as with HarperCollins' own plans to publish *Julie of the Wolves* as an e-book.  Open Road's unauthorized reproduction and public distribution of *Julie of the Wolves* by electronic means devalues HarperCollins' exclusive rights to publish the Work and threatens to divert and is diverting sales of the Work from HarperCollins.  Unless enjoined, Open Road's unlawful conduct will deprive HarperCollins of the benefits of the investments in and good will derived from its multi-decade publishing efforts in relation to the Work.

## COUNT I

### Copyright Infringement

30.     HarperCollins repeats and re-alleges each and every allegation contained in paragraphs 1 through 29 hereof with the same force and effect as if fully set forth herein.

31.     Open Road's unauthorized publishing of *Julie of the Wolves* by electronic means, entailing the reproduction of the complete text of *Julie of the Wolves* and its public distribution to third parties for sale to the consuming public, constitutes acts of direct copyright infringement in violation of exclusive copyright rights in *Julie of the Wolves* owned by HarperCollins under 17 U.S.C. § 106.

32.     In undertaking and persisting over objection in continuing these activities, Open Road's conduct constitutes willful copyright infringement.

33.     HarperCollins is entitled, under 17 U.S.C. §§ 501-502 & 504-505, to: injunctive relief; at its election, statutory damages (enhanced for willful infringement) or actual damages and Open Road's profits under the Copyright Act; and the recovery of HarperCollins' costs and reasonable attorney's fees.

### PRAYER FOR RELIEF

WHEREFORE, HarperCollins prays for judgment with respect to its Complaint as follows:

34.     Declaring that Open Road has violated 17 U.S.C. § 106 by infringing HarperCollins' copyright rights in *Julie of the Wolves* through its ongoing acts of publishing *Julie of the Wolves* by electronic means;

35.     Granting as against Open Road, its agents, servants, officers, and all those acting under its control and/or on its behalf and/or in concert with it, permanent injunctive relief

enjoining them from: advertising or promoting the sale of *Julie of the Wolves* by electronic or any other means; making copies of *Julie of the Wolves* in any format, electronic or otherwise; delivering copies of *Julie of the Wolves* to any third party, whether for sale or otherwise, and whether via electronic means or otherwise; advertising or promoting the sale in e-book format, or making copies or delivering copies to third parties in e-book format, of any other HarperCollins works as to which HarperCollins has been granted an exclusive license to publish by "electronic means" or "in book form"; directly or indirectly soliciting any HarperCollins author whose work has not been expressly reverted to that author to convey electronic rights to Open Road; and requiring Open Road to destroy all infringing copies of *Julie of the Wolves* and all other works for which HarperCollins has been granted an exclusive license to publish by "electronic means" or "in book form."

36.    Ordering Open Road to produce, within thirty (30) days after issuance of an injunction order, a report in writing and under oath setting forth in detail the manner and form in which Open Road has complied with the relief ordered therein;

37.    Ordering that Open Road be required to pay HarperCollins: under the Copyright Act, at HarperCollins' election, statutory damages (enhanced for willful infringement) or the actual damages sustained by HarperCollins as a result of Open Road's infringing conduct, together with the profits earned by Open Road; and HarperCollins' costs, disbursements, expenses, and reasonable attorney's fees.

38.    Ordering such other and further relief as is just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff HarperCollins Publishers LLC hereby demands a trial by jury to decide all issues so triable in this action.

Dated:  New York, New York
        December 23, 2011

                                        Respectfully submitted,

                                        WEIL, GOTSHAL & MANGES LLP

                        By:             _____
                                        R. Bruce Rich (RBR-0313)
                                        Mark J. Fiore (MJF-5738)
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone:  (212) 310-8000
                                        Facsimile:  (212) 310-8007
                                        Email:      bruce.rich@weil.com
                                                    mark.fiore@weil.com

                                        *Attorneys for Plaintiff*
                                        *HarperCollins Publishers LLC*

Of Counsel:
Chris Goff