**REDACTED PUBLIC VERSION**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| HARPERCOLLINS PUBLISHERS LLC, | ) ) ) ) | |
| Plaintiff, | ) ) | **Case No. 1:11-cv-09499-NRB** |
| v. | ) ) | **ORAL ARGUMENT REQUESTED** |
| OPEN ROAD INTEGRATED MEDIA, LLP, | ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**HARPERCOLLINS PUBLISHERS LLC'S**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF UNDISPUTED FACTS ...............................................................1

    HarperCollins And Its Publishing Business............................................................1

    The *Julie of the Wolves* Agreement .....................................................................2

    The Essential Attributes Of E-Books, And Their Similarities
    To Other Book Formats .........................................................................................4

    The Antecedents To E-Books .................................................................................6

    The Parties' Course Of Performance Under The Agreement ..................................7

    Extrinsic Evidence Concerning The Scope Of HarperCollins' Rights
    Under The Agreement.............................................................................................8

    Open Road's Infringing Activities In Violation Of HarperCollins' Rights.........................9

ARGUMENT ...........................................................................................................11

I.       SUMMARY JUDGMENT IS WARRANTED WHERE, AS HERE, THERE IS
         NO GENUINE DISPUTE AS TO ANY MATERIAL FACT..........................................11

II.     HARPERCOLLINS OWNS THE RIGHT TO PUBLISH, AND TO LICENSE
         THIRD PARTIES TO PUBLISH, E-BOOK VERSIONS OF THE WORK ...................11

        A.    The Agreement Conveys To HarperCollins The Right to Publish, And To
             License Third Parties To Publish, E-Book Versions Of *Julie of the Wolves*.........12

             1.    A reading of the four corners of the Agreement compels
                 summary judgment for HarperCollins .......................................................12

             2.    Open Road's anticipated rejoinders are meritless.....................................15

             3.    The parties' course of performance under the Agreement confirms
                 that the Agreement granted e-book rights to HarperCollins......................16

        B.    The Extrinsic Evidence Confirms That The Parties Intended To Grant
             Exclusive E-Book Rights To HarperCollins.............................................................17

        C.    This Circuit's "New Use" Precedents Also Support Summary Judgment In
             Favor Of HarperCollins ....................................................................................20

             1.    The "new use" of e-books is encompassed by the Agreement..................21

             2.    E-books were foreseeable at the time the Agreement was executed .........23

CONCLUSION.........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Auscape Int'l v. Nat'l Geo. Soc'y,*
    282 F. App'x 890 (2d Cir. 2008) ........................................................................................16

*Bartsch v. Metro-Goldwyn-Mayer, Inc.,*
    391 F.2d 150 (2d Cir. 1968) (Friendly, J.)....................................................21, 22, 23, 24, 25

*Bickerstaff v. Vassar Coll.,*
    196 F.3d 435 (2d Cir. 1999)..............................................................................................11

*Boosey & Hawkes Music Publ'rs, Ltd. v. Walt Disney Co.,*
    145 F.3d 481 (2d Cir. 1998)..............................................................................22, 23, 24, 25

*Bourne v. Walt Disney Co.,*
    68 F.3d 621 (2d Cir. 1995).........................................................................................22, 24

*Consol. Edison, Inc. v. Northeast Utils.,*
    426 F.3d 524 (2d Cir. 2005)..............................................................................................12

*Conzo v. City of N.Y.,*
    438 F. Supp. 2d 432 (S.D.N.Y. 2006)................................................................................17

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
    499 U.S. 340 (1991)........................................................................................................11

*Greenfield v. Philles Records, Inc.,*
    98 N.Y.2d 562 (2002) ................................................................................................12, 22

*IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.,*
    26 F.3d 370 (2d Cir. 1994)...............................................................................................17

*In re Fosamax Prods. Liab. Litig.,*
    645 F. Supp. 2d 164 (S.D.N.Y. 2009)...............................................................................20

*Kalem Co. v. Harper Bros.,*
    222 U.S. 55 (1911)..........................................................................................................23

*Koninklijke Philips Elecs. N.V. v. Cinram Int'l Inc.,*
    603 F. Supp. 2d 735 (S.D.N.Y. 2009)...............................................................................12

*L.C. Page & Co. v. Fox Film Co.,*
    83 F.2d 196 (2d Cir. 1936)..............................................................................22, 23, 24, 25

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.,*
    595 F.3d 458 (2d Cir. 2010)..............................................................................................12

## TABLE OF AUTHORITIES
### (continued)

*Marvel Worldwide, Inc. v. Kirby*,
  777 F. Supp. 2d 720 (S.D.N.Y. 2011)..................................................................20

*Marx & Co. v. Diners' Club*,
  550 F.2d 505 (2d Cir. 1977)............................................................................21

*McCarthy v. Am. Int'l Group, Inc.*,
  283 F.3d 121 (2d Cir. 2002)............................................................................21

*Metropolitan West Asset Mgmt., LLC v. Magnus Funding, Ltd.*,
  No. 03 Civ. 5539 (NRB), 2004 WL 1444868 (S.D.N.Y. June 25, 2004).................21

*Morgan Stanley Group Inc. v. New England Ins. Co.*,
  225 F.3d 270 (2d Cir. 2000)............................................................................12

*PaineWebber Inc. v. Bybyk*,
  81 F.3d 1193 (2d Cir. 1996).....................................................................11, 21

*Philadelphia Orchestra Ass'n v. Walt Disney Co.*,
  821 F. Supp. 341 (E.D. Pa. 1993).....................................................................24

*Random House, Inc. v. Rosetta Books LLC*,
  150 F. Supp. 2d 613 (S.D.N.Y. 2001), *aff'd*, 283 F.3d 490 (2d Cir. 2002).........14, 15

*Rooney v. Columbia Pictures Indus., Inc.*,
  538 F. Supp. 211 (S.D.N.Y. 1982)..............................................................23, 25

*SCS Commc'ns, Inc. v. Herrick Co.*,
  360 F.3d 329 (2d Cir. 2004).....................................................................11, 17

**STATUTES & RULES**

17 U.S.C. § 501(b).........................................................................................12

Fed. R. Civ. P. 56(a).......................................................................................11

**OTHER AUTHORITIES**

1 MULTIMEDIA & TECHNOLOGY LICENSING AGREEMENTS § 3:16................................16

Leon Friedman, 3 ENTERTAINMENT INDUSTRY CONTRACTS
  (Donald C. Farber ed., LexisNexis 2008).........................................................16

## PRELIMINARY STATEMENT

This lawsuit results from Open Road Integrated Media, Inc.'s ("Open Road") unlawful determination to publish an electronic edition of a celebrated work of children's fiction notwithstanding exclusive publication rights in the work belonging to HarperCollins Publishers LLC ("HarperCollins").  The novel at issue, *Julie of the Wolves* by Jean Craighead George (the "Work"), was first published in hardcover format in 1972 and thereafter has been supported through enormous investment by HarperCollins in multiple other publication formats.  Only through the artifice of contending that the governing publishing contract between George and HarperCollins (the "Agreement") somehow did not contemplate publication of the Work in electronic format has Open Road so brazenly infringed upon HarperCollins' rights.  In engaging in such willful infringement, Open Road has knowingly chosen to ignore explicit language in the Agreement exclusively conferring upon HarperCollins the right, not only itself to exploit the Work by, *inter alia*, "electronic means now known or hereafter invented," but also to license third parties such as Open Road to do so.  Outside of this litigation, Open Road and its CEO, Jane Friedman – a former HarperCollins CEO – have recognized that when it comes to an electronic ("e-book") version of a book such as the Work, "a book is a book is a book," and that an e-book is "just another format" for the identical text.  The very premise of Open Road's illicit publication of *Julie of the Wolves*, and the defenses it offers here, reflect an attempt to repudiate those fundamental realities.  That self-serving commercial turnabout should be rejected, and summary judgment awarded to HarperCollins on its complaint of willful copyright infringement.

## STATEMENT OF UNDISPUTED FACTS

### *HarperCollins And Its Publishing Business*

HarperCollins, whose roots date back more than 200 years, is one of the world's leading book publishers.  HarperCollins' Local Rule 56.1 Statement ("56.1 Stmt.") ¶ 1.  Its published

works span virtually every publishing genre; its authors include those of high regard; and countless of its works have achieved marked commercial success as well as critical acclaim. *Id.* ¶¶ 4-7.  Books published by HarperCollins have won numerous awards, including the Nobel Prize, Pulitzer Prize, National Book Award, Newbery Medal, and Caldecott Medal. *Id.* ¶¶ 5-6. During fiscal year 2011 (ending June 2011), HarperCollins had 166 titles on The New York Times Bestseller List, with 18 titles reaching the number one position. *Id.* ¶ 7.

As more fully set forth in the Declaration of Kate Jackson, HarperCollins' core functions are to identify works of potential readership interest, to collaborate with its authors to develop such works into publishable form, and ultimately to distribute and promote the sale of those works. *Id.* ¶¶ 8-11.  To carry out its publishing activities, HarperCollins employs some 700 editors and other publishing professionals in New York alone, who play an active role in every facet of the publishing process. *Id.* ¶ 9.  Once a work is published, HarperCollins makes further expenditures to market it and secure widespread distribution. *Id.* ¶ 10.  The respective rights and relations between HarperCollins and its authors in connection with the foregoing process are set forth in publishing contracts, one of which gives rise to this case. *Id.* ¶¶ 4, 12.

**The *Julie of the Wolves* Agreement**

*Julie of the Wolves* was published in 1972 by HarperCollins' predecessor Harper & Row, pursuant to an April 13, 1971 agreement with its author, George. *Id.* ¶¶ 12-13.  The Agreement is governed by New York law.  Declaration of R. Bruce Rich ("Rich Decl.") Exhibit ("Ex.") 1 ¶ 27. In return for conveying to HarperCollins the agreed-upon rights to exploit the Work, George received an advance and was entitled to receive (and, in fact, has received considerable) royalties based on ongoing sales of the Work. *See* 56.1 Stmt. ¶ 15.  *Julie of the Wolves* is a children's novel that tells the tale of a young girl who survives the Alaskan wilderness by emulating the ways of a wolf pack. *Id.* ¶ 13.  The Work is one of HarperCollins' more distinguished "backlist"

titles and won the Newbery Medal in 1973 for its contribution to children's literature. *Id.* ¶¶ 13-14. As of December 2011, the Work had sold more than 3.8 million copies in multiple formats – all, until Open Road's infringing acts, either published or licensed for publication by HarperCollins. *Id.* ¶ 14; *see also id.* ¶¶ 86-88.

The scope of HarperCollins' rights to publish, and to authorize third parties to publish, all or parts of the Work is provided in the Agreement. As relevant here, paragraph 1 of the Agreement grants to HarperCollins, for the term of copyright, the exclusive English-language rights in the specified territory to publish *Julie of the Wolves* "in book form." Rich Decl. Ex. 1 ¶ 1. This broad grant itself encompasses e-book publishing rights of the type Open Road has unlawfully appropriated, particularly given the virtually identical reading experience afforded by its offering to the hardcover and paperback offerings of HarperCollins, with which it directly competes (as discussed further below). 56.1 Stmt. ¶¶ 44, 48-51, 87-89. But this is not the sole – or even most obvious – provision of the Agreement that bears on whether HarperCollins has the exclusive right to exercise, or license third-party exercise, of e-book publishing rights.

The Agreement, typical of book publishing contracts, contains several "subsidiary rights" clauses, which list rights conveyed to the publisher that the publisher is not only free itself, but also to license third parties, to exploit. *Id.* ¶¶ 27-29; *see also* Rich Decl. Ex. 1 ¶¶ 7, 20, 23. Paragraph 23 of the Agreement stipulates that "the Publisher shall have the *exclusive* right to sell, lease or make other disposition of the subsidiary rights in which he has an interest" – identifying, among other such provisions, paragraph 20 of the Agreement. Rich Decl. Ex. 1 ¶ 23 (emphasis added). Paragraph 20, which was included in the Agreement at the request of George's literary agent, Curtis Brown, Ltd. ("Curtis Brown"), 56.1 Stmt. ¶¶ 38-39, in turn provides as follows:

3

> Anything to the contrary herein notwithstanding, the Publisher shall grant no license without the prior written consent of the Author with respect to the following rights in the work: use thereof *in storage and retrieval and information systems, and/or whether through computer, computer-stored, mechanical or other electronic means now known or hereafter invented* and ephemeral screen flashing or reproduction thereof, whether by print-out, phot [*sic*] reproduction or photo copy, including punch cards, microfilm, magnetic tapes or like processes attaining similar results. . . .

Rich Decl. Ex. 1 ¶ 20 (emphasis added).  A straightforward reading of paragraph 20 shows that:

- the rights in the Work exclusively conferred upon HarperCollins itself, as well as with respect to the licensing of the Work, include exploitations (i) "in storage and retrieval and information systems," "and/or" (ii) "whether through computer, computer-stored, mechanical or other electronic means now known or hereafter invented"; and

- the sole limitation on such exploitations is the requirement that, before granting licenses to third parties authorizing such uses, HarperCollins obtain the written consent of George.

In short, paragraphs 20 and 23, read in combination, require the conclusion that HarperCollins alone is authorized to exploit the rights enumerated in paragraph 20, subject only to George's prior right of approval of proposed third-party licenses of such rights.

### *The Essential Attributes Of E-Books, And Their Similarities To Other Book Formats*

As its name implies, an e-book is a book presented via "electronic" means.  56.1 Stmt. ¶ 44.  It consists of an electronic file of a book's text formatted to allow it to be read on electronic devices, including a handheld dedicated e-book reading device (*e.g.*, Amazon's Kindle, or Barnes & Noble's Nook), a smartphone (*e.g.*, an iPhone or Android phone), a pad/tablet (*e.g.*, an iPad or Android tablet), or a desktop or laptop computer.  *Id.* ¶¶ 44-45.  As Open Road's Ms. Friedman has acknowledged, all e-book reading devices are "computers."  *Id.* ¶ 46.

Open Road's *Julie of the Wolves* e-book contains the "identical words," the "identical number of words," and the "identical number of chapters" as George's original work.  *Id.* ¶ 50; *see also id*. ¶ 48.  The reading experience derived from Open Road's *Julie of the Wolves* e-book does not meaningfully differ from the experience of reading HarperCollins' paperback and

hardcover editions of the same work: the identical text is presented to the reader in the same linear fashion.  *Id.* ¶¶ 48, 50-51.  Even the manner in which the reader goes from page-to-page on an e-book reading device commonly replicates the reading experience of a paper format book, with the reader swiping her finger across the screen and the "page" then flipping in an animated fashion to mimic turning pages in a paper book.  *Id.* ¶ 49.[1]

Open Road touts its marketplace role as " █████████████████████████

███ "  *See id.* ¶ 2.  It has specifically referred to its *Julie of the Wolves* e-book as a " ███

███ " of the original work – or simply as one of its " █████ "  *Id.* ¶ 52.  Ms. Friedman has publicly acknowledged that e-books are "just another format" of books.  *Id.* ¶ 53.  In an appearance on the *Charlie Rose* television show in October 2012, in response to the question, "So you don't fear losing something about what in essence was what a book reading was about?," Ms. Friedman stated: "Absolutely not.  I mean, this is a format. . . .  [T]he e format is just another format."  *Id.*  Open Road's website echoes this recognition, in a video produced by Open Road showcasing one of its authors observing, "a book is a book is a book.  It's the same if it is on paper or if it is on an electronic tablet."  *Id.* ¶ 55.  As recently as March 14, 2013, in an interview posted on Open Road's website, Ms. Friedman reiterated that e-books are simply a "format" of books that will replace "physical books in [a reader's] own library."  *Id.* ¶ 54.

Today, e-books are directly competitive with their physical counterparts.  *Id.* ¶¶ 58-61; *see also id.* ¶¶ 87-89.  Ms. Friedman so recognizes, acknowledging that "traditional publishers" are Open Road's competitors and that "[p]hysical books" compete with its e-books.  *Id.* ¶ 58.  Indeed, Open Road was founded on the premise that a book publisher's "backlist" – that is, its older titles – "is the foundation of any strong publishing company," and that Open Road seeks

---

[1] Although not relevant to the disposition of this case, we note that no audio, video, or other multimedia is included within the text of the *Julie of the Wolves* e-book; the only added feature, an illustrated biography, appears at the end of the text, which remains unaltered.  *Id.* ¶ 51.  Per Ms. Friedman, "Our preference is not to interrupt the text."  *Id.*

out such backlist titles for publication in e-book format.  *Id.* ¶ 63; *see also id.* ¶ 2.  Further
reflecting the competitive realities, the New York Times now merges the reporting of best sellers
in several of its Sunday listings, namely, "Combined Print & E-Book Fiction" and "Combined
Print & E-Book Non-Fiction."  *Id.* ¶ 59.  In addition, e-book sales are increasing as print book
sales are decreasing, more than doubling between 2010 and 2011.  *Id.* ¶¶ 58-59.  Industry reports
show e-book sales have surpassed print sales in important categories (*e.g.*, adult fiction);
Amazon.com's e-book sales exceeded print sales for the first time in May 2011.  *Id.* ¶ 59.

In recognition of the market potential for e-book sales, HarperCollins announced the
launch of the industry's first global e-book publishing program in 2001 and was one of the first
publishers to digitize and create a digital warehouse of its content.  *Id.* ¶¶ 62-63.  HarperCollins
continues to expand its digital content and, as of December 2011, had released more than 8,700
e-books.  *Id.* ¶ 64.  But for Open Road's infringement, HarperCollins almost certainly would
have released *Julie of the Wolves* as an e-book by now.  *Id.* ¶ 89; *see also id.* ¶¶ 82-84.

***The Antecedents To E-Books***

As explained by HarperCollins' expert Dr. Andries van Dam, a computer science
professor at Brown University who has been working for nearly fifty years on systems for
creating and reading e-books, the conceptual underpinnings of e-books date to the early
mechanized text storage and retrieval systems, particularly microfilm and microfiche.  *Id.* ¶¶ 30,
66.  In 1945, Vannevar Bush envisioned a "memex" reader as a device that would store books
and other documents, and allow a user to read from it.  *Id.* ¶¶ 67-68.  In the 1950s and 1960s,
computer scientists saw the potential of combining the memex concept with the emerging
computer industry; their research was based on the idea that computers eventually would have
sufficient speed and memory to store entire books – even libraries – and would have an output
device capable of showing text on a screen.  *Id.* ¶¶ 67-70; *see also id.* ¶¶ 75-77.  By the late

6

1960s, computer manuals and other documents were created, stored, retrieved and read on computer screens of various sizes and formats.  *Id.* ¶ 71.  The 1960s and early 1970s then saw the development of many other precursors to today's e-books, including:

- in 1966, the PLATO system, an automatic teaching system that included an "electronic book" consisting of slides of text viewed on a computer-controlled electronic slide selector, *id.* ¶ 74;

- in 1967, the Hypertext Editing System, a system for creating, editing and reading documents via computer, *id.* ¶ 70;

- in 1968, the oNLline System, which permitted collaborative document editing of hypermedia documents on video displays, *id.*;

- also in 1968, an article envisioning the Dynabook, a new storage and retrieval device the size of a three-ring binder that would have a multipurpose screen that could be used for both reading and writing, *id.* ¶ 72;

- in 1969, MIT's creation of an experimental computer system for accessing the full text of 10,000 journals, *id.* ¶ 75; and

- in 1971, the development of Project Gutenberg to create electronic books of public domain works that would be stored, retrieved and read on computers, *id.* ¶ 73.[2]

Without doubt, as of 1971, when the Agreement was executed, e-books of the type offered by entities such as Open Road were foreseeable.  *See id.* ¶¶ 78-79.

***The Parties' Course Of Performance Under The Agreement***

The parties' course of performance under the Agreement further confirms HarperCollins' right to exercise, or (subject to George's consent) to license, uses of the Work in electronic formats.  The record reflects numerous requests by third parties to use excerpts of *Julie of the Wolves* in such electronic formats, including software, CD-ROMs, and websites; these requests were made to HarperCollins, which, in turn, sought George's permission for the electronic uses

---

[2] These developments led scholars and commentators at the time to consider the possibility that computers would, in the future, store thousands of books electronically and to foresee the "expected forthcoming era of paperless books, the computerized electronic fast transmission of books."  *Id.* ¶¶ 75-76; *see also id.* ¶ 77.  In other words, the horizon presented the "total production, dissemination, and display of books, magazines, journals, newspapers, reports, memos, and data by electronic means."  *Id.* ¶ 76.

pursuant to the consent language of paragraph 20 of the Agreement.  *See id.* ¶¶ 19-23.  Time and

again, George authorized the uses.  *Id.* ¶¶ 20-23.  Neither George nor her agent *ever* indicated

HarperCollins was not authorized to issue such licenses, let alone that George herself

independently retained the right to do so.  *See id.*[3]  Illustrative of such licenses is HarperCollins'

1994 license to software company Brøderbund Software, Inc. to reproduce excerpts of the Work

in a ██████████████████ – to be used "██████████████████" *Id.* ¶ 19.

***Extrinsic Evidence Concerning The Scope Of HarperCollins' Rights Under The Agreement***

   **1.  The Contemporaneous Record.**  Open Road has failed to come forward with any

evidence reflecting the parties' contemporaneous understandings of any of the pertinent

provisions of the Agreement.  Ms. George is deceased, *id.* ¶ 40, and her daughter Twig George,

although identified in Open Road's Initial Disclosures as having knowledge as to the "[i]ntent of

the author," *id.*, testified to a complete lack of knowledge on that score, *id.* ¶¶ 41-42.  She is

unfamiliar with the contract and played no role in its negotiation; has no knowledge of her

mother's understanding of any provision of the Agreement; and recalls no conversations with her

mother at any time about paragraph 20.  *Id.*

   In contrast stands the deposition testimony of James Fox, then manager of HarperCollins'

Contracts Department and later its General Counsel, who reviewed and initialed the Agreement

as conforming to HarperCollins' practices.  *Id.* ¶¶ 25-26.  Mr. Fox's testimony, based on that

contemporaneous review, bolstered by more than 35 years' experience at HarperCollins, fully

confirms the interpretation of the Agreement that paragraphs 20 and 23, read together, convey

rights to HarperCollins that encompass e-book publishing rights to the Work.  *Id.* ¶¶ 25-29.

---

[3] The only concerns George voiced with respect to these requests involved her interest in obtaining more money in connection with the issuance of several such licenses.  *See, e.g.*, *id.* ¶¶ 20-21.

**2. Expert Testimony.**  Dr. van Dam, HarperCollins' expert, has analyzed paragraph 20 from the perspective of a computer scientist, and offered an opinion that reinforces what is already clear from the language on its face: that HarperCollins' authority to license exploitations of the Work "in storage and retrieval and information systems" "and/or" "whether through computer, computer-stored, mechanical or other electronic means now known or hereafter invented" encompasses Open Road's e-book publication of the Work.  *See id.* ¶¶ 30-34.  The conclusion to be drawn from the latter clause, Dr. van Dam explains, is straightforward from even an elementary understanding of the terms "electronic means" and "computer"; the conclusion drawn from the former is equally clear in light of the essential nature of e-book readers.  *Id.* ¶ 31.[4]  Indeed, Dr. van Dam's opinion that a "storage and retrieval and information system" encompasses e-book reading devices, *id.* ¶ 32, is shared equally by Open Road.  The "All rights reserved" clause appearing at the end of Open Road's *Julie of the Wolves* e-book warns against competitive reproductions of the Work thusly: "No part of this text may be reproduced, transmitted, downloaded, decompiled, reverse engineered, or stored in or introduced into any *information storage and retrieval system*, in any form or by any means, whether electronic or mechanical, now known or hereafter invented, without the express written permission of the publisher."  *Id.* ¶ 33 (emphasis added).[5]

### Open Road's Infringing Activities In Violation Of HarperCollins' Rights

Open Road operates as a digital publisher focused on e-book publishing.  *Id.* ¶ 2. According to its own statements, its business is to "partner[] with authors, estates, and their

---

[4] As discussed in Dr. van Dam's accompanying declaration, the reports of Open Road's experts, Donald Farber and Leon Friedman, avoid addressing altogether crucial language contained in paragraph 20, and thus raise no genuine issues of material fact regarding the interpretation of contract language that can be seen as dispositive of this dispute. *See infra* at 19-20.

[5] Even were there some uncertainty as to the proper interpretation of the Agreement, Dr. van Dam provides a detailed analysis of the state of research and development of information storage and retrieval systems as of 1971, which further demonstrates the foreseeability of e-books.  *Id.* ¶¶ 66-79; *supra* at 6-7.

agents to digitize, design, distribute, and market their backlist books electronically"; to "███████████"
of books and "████████████████████████████████"; and to release the
"████████████████████████████" *Id.* ¶¶ 2, 52. Since August 2011, Open Road has been
publishing *Julie of the Wolves* as an e-book – an undertaking that entails converting the Work to
digital format and distributing it electronically. *Id.* ¶¶ 3, 50; *see also id.* ¶¶ 85-86. Open Road
currently offers the e-book for sale through online retailers. *Id.* ¶ 86. By March 2012, in sales
that are directly competitive with HarperCollins' sales of physical versions of *Julie of the Wolves*,
Open Road had sold more than ████ copies of the e-book. *Id.* ¶¶ 87-89.

Open Road proceeded with this book publishing activity over HarperCollins' strenuous
objection. *See id.* ¶¶ 80-86. In a series of communications, HarperCollins repeatedly advised
George's agent of its position that HarperCollins alone controlled e-book publishing rights for
*Julie of the Wolves.* *Id.* ¶ 82; *see also id.* ¶¶ 83-84. Open Road proceeded with its publication
notwithstanding George's agent's and its counsel's reservations as to the legal propriety of that
publication in the face of HarperCollins' contractual rights. *Id.* ¶¶ 35-37.[6] Only when Open
Road agreed to ████████████████████████████████████████████████
████████ did Open Road's publication of the Work move forward. *Id.* ¶¶ 35, 85.

For her part, Open Road's CEO, although a deeply experienced publishing industry
executive and fully aware of the dispute with HarperCollins, testified to having no independent
view of the meaning of the pertinent provisions of the Agreement, including paragraph 20,
having chosen to rely instead "on advice of counsel." *Id.* ¶ 43.

---

[6] The agent, Ginger Knowlton of Curtis Brown, evinced this uncertainty in advising Open Road at one point: "█
████████████████████████████████████████████" *Id.* ¶ 35. Her counsel, in turn, communicated
to HarperCollins that the issue was "████████." *Id.* ¶ 37.

<u>ARGUMENT</u>

I.   **SUMMARY JUDGMENT IS WARRANTED WHERE, AS HERE, THERE IS NO GENUINE DISPUTE AS TO ANY MATERIAL FACT**

Summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In opposing a summary judgment motion, "[s]tatements that are devoid of specifics, but replete with conclusions, are insufficient." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).  In actions involving interpretation of a contract, summary judgment is particularly appropriate where the contract is unambiguous.  In other words, "where the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law, and a claim turning on that interpretation may thus be determined by summary judgment." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996).  Even where extrinsic evidence is needed to interpret a contract deemed ambiguous, "summary judgment is still proper when the extrinsic evidence is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation." *SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004).

II.   **HARPERCOLLINS OWNS THE RIGHT TO PUBLISH, AND TO LICENSE THIRD PARTIES TO PUBLISH, E-BOOK VERSIONS OF THE WORK**

HarperCollins' copyright infringement claim requires a showing that it owns a valid copyright in the Work and that Open Road copied the Work.  *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  Open Road has conceded the second element, having "begun publishing *Julie of the Wolves* as e-books, converted that work to digital format and distributed it as an e-book." 56.1 Stmt. ¶ 3.  Thus, the only question to be resolved is whether HarperCollins owns the exclusive right to publish, and to license third parties to publish, e-book

versions of the Work.  The unequivocal answer to that question, from a facial reading of the

Agreement without more (and equally to the extent extrinsic evidence were needed), is yes.[7]

A.     **The Agreement Conveys To HarperCollins The Right to Publish, And To License Third Parties To Publish, E-Book Versions Of** *Julie of the Wolves*

1.     **A reading of the four corners of the Agreement compels summary judgment for HarperCollins**

The starting point for the resolution of any dispute over the meaning of a contract is the

words of the contract itself.  In interpreting these words, the court's "fundamental objective" is to

"determine the intent of the contracting parties as derived from the language employed in the

contract" – that is, "from within the four corners of the instrument."  *Consol. Edison, Inc. v.*

*Northeast Utils.*, 426 F.3d 524, 527 (2d Cir. 2005).  Since "[t]he best evidence of what parties to

a written agreement intend is what they say in their writing," a contract "must be enforced

according to the plain meaning of its terms."  *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562,

569 (2002).  Contracts should be interpreted in accordance with "common sense," which "is as

much a part of contract interpretation as is the dictionary or the arsenal of canons."  *Koninklijke*

*Philips Elecs. N.V. v. Cinram Int'l Inc.*, 603 F. Supp. 2d 735, 739 (S.D.N.Y. 2009).  It is likewise

axiomatic that contractual language must be "read in the context of the entire agreement."  *Law*

*Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010).  And a

contract whose meaning is otherwise plain is not made ambiguous – *i.e.*, "can suggest more than

one meaning," *Morgan Stanley Group Inc. v. New England Ins. Co.*, 225 F.3d 270, 275 (2d Cir.

2000) – merely because the parties urge conflicting interpretations.  *Law Debenture Trust Co.*,

595 F.3d at 466.  It is the words of the contract that control.

---

[7] As exclusive licensee of the copyright rights it has acquired, it is indisputable that HarperCollins has the right to maintain this infringement action.  *See* 17 U.S.C. § 501(b).

Applying these principles here, it is clear that the Agreement on its face gives HarperCollins the exclusive right to publish, and to license third parties to publish, e-book versions of *Julie of the Wolves*.  As noted, among other rights, the Agreement in paragraph 1 grants to HarperCollins, for the term of copyright, the exclusive English-language rights in the United States, its territories and possessions, and Canada to publish *Julie of the Wolves* "in book form."  Rich Decl. Ex. 1 ¶ 1.  Every attribute of an e-book, from its very nomenclature to its linear text reading characteristics to its substitutional effects for reading works in paper formats to how Open Road itself recognizes it – as simply a digital edition of a book – underscores that e-book publication is but one "form" of book publication.  56.1 Stmt. ¶¶ 44-49, 52-61, 86-89.

But the Court here need not rest solely – or even primarily – on the "in book form" grant. Paragraph 20, reinforced by paragraph 23, explicitly identifies certain "subsidiary" rights exclusively conferred on HarperCollins with respect to both its own exploitation of the Work and its licensing to third-parties.  *Id.* ¶¶ 17-18, 27-29.  Paragraph 20 could not be clearer in conveying exclusively to HarperCollins rights to the very form of exploitation in which Open Road has, without license from HarperCollins, engaged.  Most obviously encompassing Open Road's e-book is paragraph 20's conferral on HarperCollins of control over uses "through computer, computer-stored, mechanical or other electronic means now known or hereafter invented."  Rich Decl. Ex. 1 ¶ 20.  One needn't have a computer science degree to recognize that an e-book represents the presentation of the Work "by electronic means" and, indeed, that e-book readers are themselves "computers" on which the Work is "computer-stored."  *See* 56.1 Stmt. ¶¶ 31-34, 44-47, 52.  Open Road itself concedes as much.  *See id.* ¶¶ 33, 46, 52.

It matters not that e-books as we now know them were not commercially marketed as of 1971.  The above-cited language is far more generic – and, in any event, explicitly anticipates

future technological developments by encompassing within the scope of the grant "computer, computer-stored, mechanical or other electronic means *now known or hereafter invented*."  Rich Decl. Ex. 1 ¶ 20 (emphasis added).  Neither is it germane to resolution of this dispute that HarperCollins' exclusive rights to control e-book publication were conditioned, in the case of third-party licensing, on gaining the author's consent.  *See* 56.1 Stmt. ¶ 28-29.  While George may have had potential blocking rights as to such third-party exploitations, she did not herself retain the right separately to grant them.  Paragraph 23 of the Agreement, which states that HarperCollins has exclusive rights to license the uses listed in Paragraph 20, makes this crystal clear.  Rich Decl. Ex. 1 ¶ 23; *see also* 56.1 Stmt. ¶ 27, 29.

If the foregoing were not enough, separate and additional language of paragraph 20 reinforces the exclusive grant of e-book publishing and licensing rights to HarperCollins.  That clause also confers on HarperCollins the exclusive right to control exploitation of the Work "in storage and retrieval and information systems."  Rich Decl. Ex. 1 ¶ 20.  Once again, it is no stretch to recognize that "storage and retrieval and information systems" fully encompass the display of an e-book via an e-book reading device.  And again, Open Road itself has so recognized, in cautioning readers of its e-book edition of *Julie of the Wolves* not to make copies into any "information storage and retrieval system."  56.1 Stmt. ¶ 33.

The Agreement's language makes this dispute readily distinguishable from *Random House, Inc. v. Rosetta Books LLC*, 150 F. Supp. 2d 613 (S.D.N.Y. 2001), *aff'd*, 283 F.3d 490 (2d Cir. 2002).  In stark contrast to the contracts at issue in *Rosetta Books*, where there was no mention of electronic exploitations, the Agreement explicitly grants HarperCollins the right to control uses of the Work "by electronic means."  Rich Decl. Ex. 1 ¶ 20.  Tellingly, Rosetta Books' counsel – also Open Road's counsel here – urged the district court to find that there was

no grant of e-book rights for the very reason that none of the contracts separately "spelled out" "electronic" rights in a subsidiary rights clause akin to paragraph 20.  *See* Opposition to Plaintiff's Motion for Preliminary Injunction, attached as Rich Decl. Ex. 46, at 19-20.[8]

In sum, "the four corners" of the Agreement compel the conclusion that HarperCollins has the exclusive right to publish, and to license third parties to publish, e-book versions of *Julie of the Wolves*.  This should end the inquiry without more.

### 2.    Open Road's anticipated rejoinders are meritless

Based upon its expert proffers, we expect Open Road to resist the force of paragraph 20 by resort to at least two arguments, both meritless.  The first involves a rewriting of paragraph 20 to avoid the critical "and/or" conjunctive authorizing two independent types of exploitation: (i) "in storage and retrieval and information systems," and (ii) "through computer, computer-stored, mechanical or other electronic means now known or hereafter invented."  Recognizing the devastating impact of the latter clause on its defense, Open Road has chosen to pretend the "and/or" conjunctive giving rise to it does not exist.  In the telling words of one of its experts, "the culprit" that frustrates Open Road's preferred construction is the "unnecessary insertion" of "and/or" into the contract.  *See* Reply Declaration of Leon Friedman, attached as Rich Decl. Ex. 48, ¶ 4.  While convenient for a litigant to attempt to avoid the import of damaging contract language by labeling it an "unnecessary insertion," of course it cannot do so.[9]  Only by setting up this false construct – by eliminating completely the "and/or" conjunctive – can Open Road argue that the second, "computer, computer-stored, mechanical or other electronic means" clause,

---

[8] *Rosetta Books* is distinguishable on multiple other grounds, including that it involved different "in book form" grant language and was decided in the earliest days of e-book exploitation, when the substitutional effects of e-books for other reading formats were far less clear than they are today.

[9] In an effort to validate his rewrite, Professor Friedman cites wholly irrelevant *different* agreements excluding "and/or," *see* Declaration and Expert Report of Leon Friedman ("Friedman Decl."), attached as Rich Decl. Ex. 47, ¶¶ 20, 22.  Notably, the 1967 memorandum of George's literary agent on which paragraph 20 is based includes the very "and/or" language Friedman claims was "unnecessar[ily] inserted.  *See* 56.1 Stmt. ¶ 39.

simply modifies the first, such that paragraph 20 allegedly pertains only to information storage and retrieval systems (narrowly conceived at that).[10]

Open Road is expected to press another nonsensical argument: that because paragraph 20 is expressed as HarperCollins' right to issue licenses to third parties, that paragraph cannot be deemed to grant any rights to HarperCollins itself.  To the extent this argument attempts to misfocus this case on HarperCollins' asserted rights itself to exploit *Julie of the Wolves* in e-book format, it is (apart from being legally wrong) completely irrelevant.  This case is solely about who, as between HarperCollins and George, possessed the right to license e-book rights to a third party.  That is precisely the subject matter of paragraphs 20 and 23, and the answer to that issue is not in doubt.  More generally, Open Road's argument lacks logic; as a matter of copyright law, common sense, and publishing industry practice, HarperCollins could not have the right to grant licenses with respect to rights it does not have itself.  *See* 56.1 Stmt. ¶¶ 28-29.  Indeed, a subsidiary rights clause like paragraph 20 "*allows not only the publisher to use the work in any manner it chooses*, but also allows the publisher to permit others to use the work."  1 MULTIMEDIA & TECHNOLOGY LICENSING AGREEMENTS § 3:16 (emphasis added).[11]

### 3.   The parties' course of performance under the Agreement confirms that the Agreement granted e-book rights to HarperCollins

The parties' course of performance under a contract may also be considered – as support for the words of the contract – to "determine the meaning of [contractual] language."  *Auscape Int'l v. Nat'l Geo. Soc'y*, 282 F. App'x 890, 891 (2d Cir. 2008).  Unlike with extrinsic evidence,

---

[10] This contract sleight-of-hand is, in any event, unavailing insofar as a proper conception of "storage and retrieval and information systems" encompasses the e-book publication here at issue.  *See infra* at 19-20.

[11] Equally unavailing is any suggestion by Open Road that subsidiary rights clauses authorize the licensing solely of portions of works.  *See* Leon Friedman, 3 ENTERTAINMENT INDUSTRY CONTRACTS (Donald C. Farber ed., LexisNexis 2008), Form 41-1(4) at 41-34 (defining subsidiary rights as "the right to license certain uses of the book to others," and stating, "[t]he most important such right is the right to sell 'soft cover' or 'paperback' rights," which denotes the licensing of full works).

"[t]here is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown."  *Id.*  Thus, the parties' performance "for any considerable period of time before it comes to be the subject of controversy" sheds light on their "practical interpretation" of the contract and serves as an additional corroborative tool in contract interpretation.  *IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 374 (2d Cir. 1994); *see also Conzo v. City of N.Y.*, 438 F. Supp. 2d 432, 436 (S.D.N.Y. 2006).

The parties' course of performance under the Agreement underscores that HarperCollins has broad rights to exploit the Work – whether itself or via licenses with third parties – by "electronic means."  As discussed, the record is replete with evidence demonstrating requests by third parties to HarperCollins to make uses of *Julie of the Wolves* in electronic formats.  *See* 56.1 Stmt. ¶¶ 19-24.  As required by paragraph 20, HarperCollins sought George's permission to license such uses; George repeatedly authorized them, and she *never* objected on the basis that HarperCollins was not entitled to exercise those rights in the first instance.  *See id.* ¶¶ 20-23.

### B. The Extrinsic Evidence Confirms That The Parties Intended To Grant Exclusive E-Book Rights To HarperCollins

Should the Court choose to look beyond the four corners of the Agreement (and potentially the parties' course of dealing thereunder) to resolve any contractual ambiguities, summary judgment still should be granted to HarperCollins because the extrinsic evidence bearing on this controversy fully confirms that the Agreement grants to HarperCollins, and not George, exclusive e-book publication rights.  Indeed, "the extrinsic evidence is so one-sided that no reasonable factfinder could decide contrary to [HarperCollins'] interpretation."  *SCS Commc'ns, Inc.*, 360 F.3d at 342.

First, in support of the conclusion that Open Road's e-book of the Work represents

publication of the Work "in book form," Rich Decl. Ex. 1 ¶ 1, there is abundant record evidence

showing that e-books are merely another version of books, like paperbacks and hardcovers:

- Open Road's Ms. Friedman has publicly stated that e-books are "just another format" of books that will replace "physical books in [a reader's] own library." And Open Road's website features a video with one of its authors observing, "a book is a book is a book." 56.1 Stmt. ¶¶ 53-55.

- Open Road's own documents characterize the *Julie of the Wolves* e-book as merely a "███████████" of the original work; Open Road's marketing materials state that it "███████████████████████████"; and Open Road employees repeatedly refer to the *Julie of the Wolves* e-book simply as one of its "████." *Id.* ¶ 52.

- Ms. Friedman testified that the *Julie of the Wolves* e-book contains the "identical words," the "identical number of words," and the "identical number of chapters" as George's original work. *Id.* ¶ 50.

- E-books today are directly competitive with their physical counterparts. Ms. Friedman herself testified that "traditional publishers" are Open Road's competitors and that "[p]hysical books" compete with its e-books. *Id.* ¶ 58; *see also id.* ¶¶ 59-61. As recently as March 14, 2013, Ms. Friedman observed that e-books would soon replace "physical book in [a reader's] library." *Id.* ¶ 54.

In addition, the record includes only one percipient witness – James Fox, then manager of

HarperCollins' Contracts Department and later its General Counsel. *Id.* ¶ 25. Mr. Fox's

deposition testimony fully corroborates the plain reading of the Agreement that George was not

authorized to license e-book publication rights to Open Road; to the contrary, he testified, the

Agreement gives HarperCollins the right to publish, or authorize third parties to publish, e-book

versions of *Julie of the Wolves*. *Id.* ¶¶ 27-29.[12] Against this evidence, Open Road proffers Twig

George, who, as discussed above, was unable to offer any probative testimony concerning the

parties' intent as of the time the contract was entered into. *Id.* ¶¶ 40-42.

---

[12] As noted above, even George's agent and its counsel expressed uncertainty as to Open Road's rights to publish a *Julie of the Wolves* e-book. *See* 56.1 Stmt. ¶¶ 35-37.

As for experts, only one – Dr. van Dam on behalf of HarperCollins – has opined as to the *full* scope of paragraph 20 *as written*, including the critical language regarding exploitations of the Work "through computer, computer-stored, mechanical or other electronic means now known or hereafter invented."  Regarding this language, Dr. van Dam explains that "Open Road took the identical text by the author and heretofore published in paper formats and had that text converted into a digitized format that is readable by computer software residing on electronic devices." Declaration of Andries van Dam ("van Dam Decl.") ¶ 17.  In other words, "what Open Road has done is present the work to readers in an electronic format, *i.e.*, 'by electronic means.'"  *Id.*  As for paragraph 20's separate coverage of publication "in storage and retrieval and information systems," Dr. van Dam explains that such a system "is, as its name indicates, a technology that allows for information to be stored on a device and then retrieved by users of that device.  The concept of e-books fits squarely within this definition."  *Id.* ¶ 21.[13]

In sharp contrast to Dr. van Dam's opinion, Open Road's two experts, Leon Friedman and David Farber, ignore the most salient language in paragraph 20, pertaining to publication "through computer, computer-stored, mechanical or other electronic means no known or hereafter invented," relying on the fiction, earlier described, that the "and/or" conjunctive preceding that language simply does not exist.  As to that dispositive clause, Dr. van Dam's expert testimony stands uncontested.  *See* Amended Declaration and Expert Report of David Farber ("Farber Decl."), attached as Rich Decl. Ex. 50, ¶¶ 4, 9-21; Friedman Decl. ¶¶ 8, 18.

Professor Farber's testimony on that portion of paragraph 20 on which he does focus fares no better.  As Dr. van Dam demonstrates, Professor Farber posits an unduly narrow

---

[13] Dr. van Dam further notes that: additional language in paragraph 20, listing rights to use the work in "ephemeral screen flashing or reproduction thereof, whether by print-out, phot [*sic*] reproduction or photo copy, including punch cards, microfilm, magnetic tapes or like processes attaining similar results," reinforces that the grant of rights encompasses virtually any means of distribution or presentation; and the language "like processes attaining similar results" makes clear that the list is not limited to only the identified techniques. *Id.* ¶¶ 14, 19.

definition of "storage and retrieval and information systems." *See van Dam Decl.* ¶¶ 41-44.

Professor Farber asserts that this terminology covers solely "systems in which books and other

publications would be analyzed, indexed, classified, and abstracted, including by computers," but

he reaches this conclusion via a highly selective discussion covering only a portion of the

spectrum of the technological innovations that were being explored and developed by 1971. *Id.*

¶ 40; Farber Decl. ¶ 18.  In particular, he omits the research and deployment of "storage and

retrieval and information systems" for displaying electronic documents – both textual, linear

documents such as novels, and non-linear documents along the lines of those discussed by Dr.

van Dam.  Ignoring all of that technology, Dr. Farber reduces "storage and retrieval and

information systems" to no more than indexing and cataloguing schemes akin to library card

catalogs.  *See van Dam Decl.* ¶¶ 22, 40.  This constrained view – that such systems somehow do

not encompass reading e-books via e-book reading devices – arises solely from Dr. Farber's

cherry-picking of technology and is completely undermined by Open Road's own "All rights

reserved" clause, as noted above.  *See* 56.1 Stmt. ¶ 33.

   The testimony of Professor Friedman, a law professor and practicing attorney, is not only

wide of the mark, but also is impermissible because it unabashedly states his so-called "expert"

views as to the supposed intentions of the parties to the Agreement.[14]  Illustratively, Professor

Friedman states that George "intended to limit the grants contained in the . . . [A]greement,"

Friedman Decl. ¶ 10, but he has no knowledge of that fact, making his opinion legally irrelevant.

And although he claims to testify as to "custom and trade usage," Professor Friedman in reality

merely opines on the legal interpretation of the Agreement's language – also plainly

---

[14] *See Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 730 (S.D.N.Y. 2011) (holding "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony"); *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (expert testimony on state of mind of defendant and others was conjecture and "not a proper subject for expert or even lay testimony").

impermissible.  *See, e.g.*, *Marx & Co. v. Diners' Club*, 550 F.2d 505, 509 (2d Cir. 1977) (holding that expert opinion purporting to interpret contract language is inadmissible).

Finally, Open Road has adduced evidence that paragraph 20 of the Agreement derives from a 1967 memorandum of Curtis Brown and was inserted into the Agreement by George's agent at the time.  This fact cuts against Open Road.  *See Metropolitan West Asset Mgmt., LLC v. Magnus Funding, Ltd.*, No. 03 Civ. 5539 (NRB), 2004 WL 1444868, at *5 (S.D.N.Y. June 25, 2004) (Buchwald, J.) ("[W]here a contract contains an ambiguity or contradiction . . ., the 'contra proferentem' principle requires that the contract be construed against the drafter."); *see also McCarthy v. Am. Int'l Group, Inc.*, 283 F.3d 121, 124 (2d Cir. 2002) ("[E]quivocal contract provisions are generally to be construed against the drafter.").[15]

### C.    This Circuit's "New Use" Precedents Also Support Summary Judgment In Favor Of HarperCollins

Any resort by the Court to extrinsic evidence (which HarperCollins believes is unnecessary) should be guided by the Second Circuit's "new use" case law, which addresses circumstances where the underlying contract is ambiguous as to the scope of the contractual grant of rights in relation to later-developed technology – a so-called "new use."

### 1.    The "new use" of e-books is encompassed by the Agreement

Under the "new use" precedents, where the scope of a contractual grant is ambiguous, "the licensee may properly pursue any uses which may reasonably be said to fall within the medium as described in the license."  *Bartsch v. Metro-Goldwyn-Mayer, Inc.*, 391 F.2d 150, 155 (2d Cir. 1968) (Friendly, J.).  The supporting rationale is that, "[i]f the words [of a grant of rights] are broad enough to cover the new use, it seems fairer that the burden of framing and negotiating

---

[15] The purpose of this rule is to prevent the drafter of an ambiguous document from "claim[ing] the benefit of the doubt in construing any ambiguities," as well as "to protect the party who did not choose the language from an unintended or unfair result."  *PaineWebber Inc.*, 81 F.3d at 1199.

an exception should fall on the grantor," recognizing the significant investment in the work that will have been made by the licensee over time.  *Id.*; *accord Boosey & Hawkes Music Publ'rs, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 486 (2d Cir. 1998).[16]  Consistent with this guidance, courts repeatedly have found a "new use" to fall within an underlying contract.[17]

Under this authority, it is clear that publication of *Julie of the Wolves* as an e-book properly was reserved to HarperCollins.  For one, the language of paragraph 20 covering exploitations of the Work "in storage and retrieval and information systems, and/or whether through computer, computer-stored, mechanical or other electronic means now known or hereafter invented" more than reasonably supports e-books as a new use.  *See* Rich Decl. Ex. 1 ¶ 20; *supra at* 8-9, 12-15.  This conclusion is only fortified by Open Road's admissions that an e-book is "just another format" of a book, involving reading the identical words in an identical fashion as is experienced by readers of paper editions of the same work.  56.1 Stmt. ¶ 53; *see also id.* ¶¶ 54-55.  What is more, George nowhere excluded exploitation of the Work in e-book format by "language of limitation," let alone by a reservation of rights arising out of later-developed technology.  *See Boosey*, 145 F.3d at 486.  The opposite is true: George granted HarperCollins, via a clause inserted by her agent, broad exploitation rights via technologies "now known or hereafter invented."  Rich Decl. Ex. 1 ¶ 20.  That an e-book is read on a handheld

---

[16] *See also id.* at 487 (where license language was "more reasonably read to include than to exclude" new use, "the burden fell on [the author], if he wished to exclude new markets arising from subsequently developed . . . technology, to insert such language of limitation in the license, rather than on [the grantee] to add language that reiterated what the license already stated"); *Bartsch*, 391 F.2d at 155 (if grantor wished to limit the ways in which grantee can use a work, he or she "could have said so" in the agreement).

[17] *See, e.g., Boosey*,145 F.3d 481 (1939 license conveying motion picture rights extended to the sale and rental of later-developed video-cassettes and video discs); *Bourne v. Walt Disney Co.*, 68 F.3d 621, 630 (2d Cir. 1995) (1930s agreement licensing Disney rights to utilize certain musical compositions in motion pictures construed as permitting Disney's use of such music in video cassettes, with the court noting: "the physical form in which the motion picture is fixed – film, tape, discs, and so forth – is irrelevant"); *Bartsch*, 391 F.2d 150 (1930 grant of motion picture rights to a musical play also encompassed later-developed television rights); *L.C. Page & Co. v. Fox Film Co.*, 83 F.2d 196, 198-99 (2d Cir. 1936) (1923 grant of "exclusive moving picture rights" – at the time, only silent films – included the right to exhibit "talking" motion pictures that were not commercially in use at the time of the license); *cf. Greenfield*, 98 N.Y.2d at 572 ("[T]he unconditional transfer of ownership rights to a work of art includes the right to use the work in any manner unless those rights are specifically limited by the terms of the contract.").

device or computer screen, rather than on paper, is of no legal significance: "The essence of the matter . . . is not the mechanism employed, but that we see the event or story lived." *Kalem Co. v. Harper Bros.*, 222 U.S. 55, 61 (1911).

### 2.   E-books were foreseeable at the time the Agreement was executed

The Second Circuit has held open the question whether its "new use" precedents require an additional showing that the new use was foreseeable at the time the license was executed. *See Boosey*, 145 F.3d at 486 (whether a new use must have been foreseeable is "a question left open in *Bartsch*"). To the extent a demonstration of foreseeability is deemed appropriate, HarperCollins plainly has made such a showing.

As an initial matter, the Court need look no farther than the Agreement itself, insofar as it expressly covers exploitations via "computer, computer-stored, mechanical or other electronic means *now known or hereafter invented*." Rich Decl. Ex. 1 ¶ 20 (emphasis added). By the words "hereafter invented," the parties plainly intended to cover later-developed exploitations of the Work. *See Rooney v. Columbia Pictures Indus., Inc.*, 538 F. Supp. 211, 224 (S.D.N.Y. 1982) (finding contract "clearly and unambiguously" granted rights where rights included: "any present or future kind of motion picture production," "by any present or future methods or means," and "by any other scientific, mechanical or electronic means, method or device now known or hereafter conceived or created").

Even were that not the case, HarperCollins easily has satisfied any apposite foreseeability standard. A new use is foreseeable if it is "a forward step in the same art," and whether the format in question was actually contemplated is of no moment. *Page*, 83 F.2d at 199 ("The mere fact that the species 'talkies' may have been unknown and not within the contemplation of the parties in their description of the generic 'moving pictures' does not prevent the latter from comprehending the former."). Similarly, a new use is foreseeable where, at most, "a nascent

market" existed at the time. *Boosey*, 145 F.3d at 486.  This showing is not stringent; it suffices

that "future possibilities" were recognized, *Bartsch*, 391 F.2d at 154, and extant commercial

availability is not required.  *Page*, 83 F.2d at 198-99 ("'Talkies' were not commercially known in

1923, but inventors had been experimenting with the idea for some years.").[18]

Here, HarperCollins' expert Dr. van Dam has established that publishing via electronic

means, including e-books, was foreseeable within the contemplation of the law as of 1971, when

the Agreement was executed.  The conceptual underpinnings of today's e-book technology date

back to the early mechanized text storage and retrieval systems such as microfilm and

microfiche.  56.1 Stmt. ¶ 66.  Electronic delivery of books and other textual works was further

anticipated as early as the 1950s and 1960s, when computer scientists envisioned and

experimented with devices that could store books, documents and even entire libraries

electronically.  *See id.* ¶¶ 69-75.  Indeed, as early as 1969 – two years before the Agreement was

executed – copyright experts and research scholars aware of the advances in such technologies

noted the possibility that computers would, in the not-too-distant future, be capable of storing

thousands of books and predicted an "expected forthcoming era of paperless books, the

computerized electronic fast transmission of books."  *Id.* ¶¶ 75-77.

Open Road's proffered contrary opinion as to foreseeability from Professor Farber is

flawed as a matter of law.  Dr. Farber opines that e-books were not foreseeable in 1971 because

there was no actual existing market for e-books at the time.  *See* Farber Decl. ¶ 8.  This

conception of foreseeability fundamentally misconstrues the inquiry and has been uniformly

rejected.  As this Court has held, "[w]here as here, a party has acquired a contractual right which

---

[18] *See also Bourne*, 68 F.3d at 630 (holding new use was covered by agreement where it was "within the contemplation of persons in the . . . industry" and advances in technology "were under development" at the time; *Philadelphia Orchestra Ass'n v. Walt Disney Co.*, 821 F. Supp. 341, 346 (E.D. Pa. 1993) (holding new use was covered by agreement where the use had been "contemplated by some inventive minds" at the time and where there was "evidence that a precursor to today's home video technology was under development").

may fairly be read as extending to media developed thereafter, the other party can hardly avoid the contract's application to such media by establishing that the precise nature of the advance was not anticipated." *Rooney*, 538 F. Supp. at 229. The issue is not, as Dr. Farber conceives it, whether e-book technology was fully developed and commercially viable when the Agreement was executed. Rather, the law establishes that foreseeability (to the extent required) is satisfied where: the new use is "a forward step in the same art," *Page*, 83 F.2d at 199; there is evidence that a "nascent market" existed, *Boosey*, 145 F.3d at 486; or "future possibilities" were recognized, *Bartsch*, 391 F.2d at 154. What is undeniably *not* required is commercial availability of the technology at the time. *See Page*, 83 F.2d at 198-99.

## CONCLUSION

For the foregoing reasons, HarperCollins respectfully requests that the Court grant its Motion for Summary Judgment and enter judgment in its favor that Open Road, by publishing *Julie of the Wolves* as an e-book, is infringing HarperCollins' rights under copyright law.

Dated:  New York, New York
    March 18, 2013                 Respectfully submitted,

                                   WEIL, GOTSHAL & MANGES LLP

                   By:             _____
                                   R. Bruce Rich (RBR-0313)
                                   Mark J. Fiore (MJF-5738)
                                   Sabrina A. Perelman (SP-2268)
                                   767 Fifth Avenue
                                   New York, New York 10153
                                   Tel: (212) 310-8000
                                   Fax: (212) 310-8007

                                   *Attorneys for Plaintiff HarperCollins Publishers LLC*