UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| HARPERCOLLINS PUBLISHERS LLC, | : | |
| | : | |
| Plaintiff, | : | Civ. Act. No. 1:11-cv-09499-NRB |
| | : | |
| v. | : | ECF Case |
| | : | |
| OPEN ROAD INTEGRATED MEDIA, INC., | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Michael J. Boni (Pro Hac Vice)
John E. Sindoni (Pro Hac Vice Pending)
BONI & ZACK LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
(610) 822-0200
mboni@bonizack.com
jsindoni@bonizack.com

Robert J. LaRocca (Pro Hac Vice Pending)
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700
rlarocca@kohnswift.com

Robert F. Levine (RFL-3918)
Kim G. Schefler (KGS-4912)
LEVINE PLOTKIN & MENIN LLP
1740 Broadway, 22nd Floor
New York, NY 10019
Tel: (212) 245-6565
rlevine@lpmny.com
kschefler@lpmny.com

*Attorneys for Defendant
Open Road Integrated Media, Inc.*

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT .................................................................................1

II.   SUMMARY OF UNDISPUTED FACTS ...............................................................3

III.  ARGUMENT ...........................................................................................................7

      A.    The Legal Standards .................................................................................7

            1.    The Standard for Summary Judgment ........................................7

            2.    The Standard for "New Use" Cases ............................................8

      B.    E-Books Are Not "In Book Form" .........................................................11

            1.    *Rosetta Books* Compels Summary Judgment in Favor of Open Road ...........................................................................................11

            2.    Reservation of Rights Provision ...............................................15

            3.    Open Road's Expert Report on the Trade Usage of "In Book Form" Is Unrebutted and All Experts Agree Print and Digital Are Different Media ...........................................................................15

            4.    There Was No Nascent E-Book Market in 1971 (or 1981 or 1991)..........17

      C.    Paragraph 20 Does Not Convey E-book Publication Rights .................................19

            1.    Paragraph 20 Does Not Include Any Publication Grant...........................19

            2.    Harper's Strained Construction of Paragraph 20 Would Render it Unenforceable Under New York Contract Law ........................................20

            3.    Under the New Use Analysis, Paragraph 20 Cannot Be Construed to Encompass E-Books ...........................................................................21

            4.    Paragraph 20 Is Like the Photocopy Clauses in *Rosetta Books* .................25

IV.  CONCLUSION.......................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Bartsch v. Metro-Goldwyn-Mayer, Inc.*,
    391 F.2d 150 (2d Cir. 1968)................................................................... passim

*Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*,
    145 F.3d 486 (2d Cir. 1998)................................................................... passim

*Bourne v. Walt Disney Co.*,
    68 F.3d 621 (2d Cir. 1995)................................................................... passim

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce,*
    *Fenner & Smith Inc.*,
    232 F.3d 153 (2d Cir. 2000)......................................................................... 7-8

*Field v. True Comics*,
    89 F. Supp. 611 (S.D.N.Y. 1950)...............................................................13

*JA Apparel Corp. v. Abboud*,
    568 F.3d 390 (2d Cir. 2009)........................................................................15

*Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*,
    265 F.R.D. 106 (S.D.N.Y. 2010) ................................................................20

*Random House v. Rosetta Books*,
    150 F. Supp. 2d 613 (S.D.N.Y. 2001)....................................................... passim

*Random House v. Rosetta Books*,
    283 F.3d 490 (2d. Cir. 2002)...................................................................2, 24

*Sayers v. Rochester Telephone Corp.*,
    7 F.3d 1091 (2d Cir. 1993)...........................................................4, 5, 15, 23

*Weeks Marine, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n*,
    2011 U.S. Dist. LEXIS 95358 (S.D.N.Y. Aug. 25, 2011) .....................................7

**State Cases**

*Gen. Motors Acceptance Corp. v. Berg & Duffy*,
    460 N.Y.S.2d 899 (Sup. Ct. 1983)...............................................................21

*Grace v. Nappa*,
    46 N.Y.2d 560, 389 N.E.2d 107 (1979).........................................................20

*Greenfield v Philles Records, Inc.*,
    98 N.Y.2d 562, 780 N.E.2d 166 (2002).........................................................11

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,*
   52 N.Y.2d 105, 417 N.E.2d 541 (1981)...................................................................20

*Wood v. Lady Duff-Gordon,*
   222 N.Y 88, 118 N.E. 214 (1917)......................................................................15

*Markham Gardens L.P. v. 511 9th LLC,*
   954 N.Y.S.2d 811 (Sup. Ct. 2012)......................................................................20

*Morlee Sales Corp. v. Manufacturers Trust Co.,*
   9 N.Y.2d 16, 172 N.E.2d 280 (1961)...................................................................21

**Rules**

Fed. R. Civ. P. 56(a) .......................................................................................7

**Other Authorities**

JOSEPH BECKER & ROBERT M. HAYES, INFORMATION STORAGE AND RETRIEVAL: TOOLS,
   ELEMENTS, THEORIES (1963 & 1967) ..........................................................22

F. WILFRID LANCASTER, INFORMATION RETRIEVAL TODAY (1993) ...............................22

AMY N. LANGVILLE & CARL D. MEYER, *Introduction to Web Search Engines and a Short
   History of Information Retrieval, in* GOOGLE'S PAGERANK AND BEYOND (2006)..................22

Noah S. Prywes, *Online Information Storage and Retrieval*, CIS Technical Reports
   (1968), *available at* http://repository.upenn.edu/cis_reports/823/...........................22

O.E. Taulbee, *Classification in Information Storage and Retrieval, in* ASSOCIATION OF
   COMPUTING MACHINERY, PROCEEDINGS OF THE 1965 20TH ANNUAL CONFERENCE
   (1965), *available at* dl.acm.org/citation.cfm?id=806038 ......................................22

C.J. VAN RIJSBERGEN ET AL., INFORMATION RETRIEVAL (2d ed. 1979), *available at*
   http://dcs.gla.ac.uk/Keith/Preface.html.............................................................22

Amit Singhal, *Modern Information Retrieval: A Brief Overview*, in BULLETIN OF THE
   IEEE COMPUTER SOCIETY TECHNICAL COMMITTEE ON DATA ENGINEERING (2001),
   *available at* http://singhal.info/ieee2001.pdf...................................................22

UNDERSTANDING INFORMATION RETRIEVAL SYSTEMS: MANAGEMENT, TYPES,
   STANDARDS (Marcia J. Bates ed. 2012) .............................................................22

## I.   PRELIMINARY STATEMENT

In 1971, noted children's author Jean Craighead George contracted with the predecessor of HarperCollins Publishers LLC ("Harper") to publish in hardback her work *Julie of the Wolves*. The book won the prestigious Newbery Award, and print sales of the work made many millions of dollars for Harper.

Forty years later, e-book publisher Open Road Integrated Media, Inc. ("Open Road") offered to pay Ms. George a 50% royalty to publish her work as an e-book. Ms. George was intrigued by Open Road's offer and the prospect of bringing her work to a new medium. Still, she wanted to keep her works "in-house" with her print publisher. So she asked Harper to publish *Julie of the Wolves* as an e-book for the same royalty. Harper flatly refused. It told her it would publish the e-book, but only for a 25% royalty. Moreover, it told her she effectively had no choice but to accept whatever Harper was willing to pay no matter how unfair she thought it was. That is because, contrary to Ms. George's own understanding, Harper contended she had already granted Harper the exclusive right to publish her work as an e-book, forty years ago. This was so, according to Harper, even though, among other things, (1) the contract is silent as to e-book publishing rights and lacks a royalty provision in exchange for those rights, (2) Ms. George expressly reserved all rights not specifically granted, and (3) the technology for such a product did not exist until many years later and a commercially viable e-book publishing market did not take hold until just a few years ago. Disagreeing with Harper's assessment and believing she had reserved those rights, Ms. George contracted with Open Road.

Harper sued Open Road for copyright infringement in December 2011. In the first paragraph of its complaint, Harper summed up its claim as follows:

> HarperCollins' agreement with author Jean Craighead George ("George"), among other pertinent provisions, grants HarperCollins the exclusive right to publish George's children's novel *Julie of the Wolves* (herein sometimes "the Work") ***"in***

> **book form,"** *including explicitly via* **"computer, computer-stored, mechanical or other electronic means now known or hereafter invented."** (Emphasis added.)

In so doing, Harper misleadingly attempts to bridge the primary grant language in Paragraph 1— to publish the work "in book form"—with language that appears four pages later in Paragraph 20— which has nothing at all to do with Harper's publishing rights. The terms on which Harper seizes—"*computer, computer-stored, mechanical or other electronic means now known or hereafter invented*"— pertain solely to storage and retrieval systems, not the primary right to publish the work "in book form."

Setting aside Harper's attempted sleight of hand, Harper contends that Paragraphs 1 and 20, alone or together, confer on it e-book publishing rights. Paragraph 1 grants to Harper the right to publish the work "in book form," and is understood to be a limited grant in the publishing industry. Judge Stein already adjudicated the identical phrase in *Random House, Inc. v. Rosetta Books LLC,* 150 F. Supp. 2d 613 (S.D.N.Y. 2001), *aff'd*, 283 F.3d 490 (2d. Cir. 2002), and found that this term excluded e-books. Judge Stein's reasoning is equally applicable here. Moreover, Open Road has submitted an expert report by Prof. Leon Friedman (whose previous declaration Judge Stein cited with approval, 150 F. Supp. 2d at 622), explaining why this is the correct trade usage construction. Harper has submitted no expert declaration discussing that term at all, let alone contesting Judge Stein's and Prof. Friedman's construction of the term.

 Paragraph 20, which was inserted in the contract not by Harper but by Ms. George's literary agent, is a "storage and retrieval clause" and offers no more support for Harper's claims. By its plain terms it refers to licensing subsidiary rights to a third party (subject to the author's consent) and lacks any terminology that could be construed as publishing grant language. Additionally, there is no royalty provision, so even if it could be construed as conferring a publishing right, it would be unenforceable because it lacks an essential term. Aware of

Paragraph 20's shortcomings as a publishing grant, Harper's witnesses testified that Harper's right to publish e-books of *Julie of the Wolves*, and obligation to negotiate a mutually acceptable royalty with Ms. George, are "implied." However, it is not the Court's role to insert implied terms or otherwise rewrite the provision to include a publishing grant.

In reality, Paragraph 20 is not a publishing grant at all; it merely sets forth the conditions under which Harper may—with Ms. George's consent—license others to use the work in systems for indexing, classifying, abstracting, and searching for information about books and periodicals. Indeed, Harper's novel interpretation of Paragraph 20 to extend to anything beyond an information storage and retrieval system contradicts its own prior conduct. In the 1990's, Harper included electronic rights grant language in the "Subsidiary Rights" sections of its form contracts. It listed and thereby differentiated two separate and distinct types of electronic rights: "verbatim electronic displays" (i.e., e-books) and "information storage and retrieval systems."

Summary judgment should be granted for Open Road.

## II.    SUMMARY OF UNDISPUTED FACTS

The facts of this case are neither complex nor materially in dispute. On April 13, 1971, Ms. George contracted with Harper to publish her seminal work *Julie of the Wolves* "in book form" and in a limited geographical territory. (Open Road's Statement of Undisputed Facts, hereafter "SOF" ¶¶ 4, 8.) "In book form" appears in Paragraph 1, the grant language of the contract. (SOF ¶ 8.) It has been for decades the standard grant language that trade usage in the publishing industry has understood to mean paper forms of the work. (SOF ¶¶ 8-13.) Harper published the hardback in 1972. (SOF ¶ 5.) The work won the prestigious Newbery Award in 1973 for children's literature and was nominated for a National Book award. (SOF ¶ 6.)

Harper alleges that it has sold "more than 3,800,000 units of *Julie of the Wolves*," including hardcover and paperback formats. (SOF ¶ 7.) Both hardback and paperback editions

3

and their respective royalties are set forth in the contract. (SOF ¶¶ 19, 21.) There is no mention of e-books and no provision for e-book royalties. (SOF ¶ 22.) The contract contains a broad reservation of rights in Ms. George's favor as to all rights that exist and may "hereafter come into existence" that are "not specifically herein granted." (SOF ¶ 16.)

Curtis Brown was Ms. George's literary agency, and it negotiated the 1971 contract on her behalf. (SOF ¶ 28.) In negotiating for *Julie of the Wolves,* it struck out and modified provisions in Harper's form contract (SOF ¶ 28), conveying only limited rights. One such modification was Curtis Brown's insertion of a new Paragraph 20, which replaced a much broader form contract provision covering all mechanical, visual and sound reproduction (except motion pictures, radio and television). (SOF ¶¶ 28-29.) This new Paragraph 20 requires the author's approval if Harper wishes to license to third parties the right to use *Julie of the Wolves* in any type of information storage and retrieval system, "whether computer, computer-stored, mechanical or other electronic means now known or hereafter invented" (SOF ¶¶ 23, 26),[1] and for making photocopies (*see* Section III.C.4, below). It provides that the author and Harper split equally the net licensing proceeds from the third party licensees. The paragraph has no royalty provision (SOF ¶¶ 22, 23), which is the standard method of compensating an author for sales of editions of her work (SOF ¶¶ 19, 20).

Paragraph 20 is a provision Curtis Brown inserted on behalf of authors in contracts it negotiated, beginning in 1967. (SOF ¶¶ 30-32.) The paragraph referred to storage and retrieval systems, then in their infancy, that would use computers to analyze, index, classify and abstract

---

[1] The original paragraph 20 as drafted by Curtis Brown in 1967 and used until the early 1970's contains the syntactically awkward words "and/or whether" after the words "use thereof in storage and retrieval and information systems." (SOF ¶¶ 28-31.) In all eight of the subsequent contracts between Ms. George and Harper in which ¶ 20 was used, the words "and/or" were dropped while the word "whether" was retained, e.g., "use thereof in storage and retrieval systems, whether through computer, computer-stored, mechanical or other electronic means now known or hereafter invented . . . ." (SOF ¶ 32.)

information. (SOF ¶¶ 33-37.) It did not and does not refer to e-book publication rights. (*Id.*) In the 1990's Harper carefully distinguished between the right to use the work for "display of verbatim text" (i.e., e-books), which was in one electronic rights clause, and in "information, storage retrieval systems," which was in another electronic rights clause. (SOF ¶¶ 53-60.)

There could be no possible market for e-books until there was a convergence of five separate technologies. (SOF ¶¶ 38-48.) This did not occur before the late 1980's. (SOF ¶¶ 47-48.) Even then, e-books did not become a reality for many years. Of about 60 Harper/George contracts spanning the 1960's to 2006 (SOF ¶ 56), none mentions "verbatim" text of the work until 1989 (SOF ¶¶ 57-59), and Harper admits e-books did not exist as of 1996. (SOF ¶ 60.) It first announced its intention to publish e-books in 2001. (SOF ¶ 61.) As of 2005, Harper was still trying to get its "digital house in order" and develop its e-book program. (SOF ¶ 62.)

There was no real market for e-books until Amazon launched the Kindle in 2007. (SOF ¶ 44.) Indeed, a Harper editor acknowledged that the market had not even truly developed as of December 2010. (SOF ¶ 63.) There is no disagreement that the print medium of books and the digital medium of e-books are separate and distinct media. Prof. Andries Van Dam, Harper's technology expert, agreed in the *Rosetta Books* case that "the computer is a different medium than a print book." (SOF ¶ 49.) Open Road's technology expert, Prof. David Farber, agrees. (SOF ¶ 50.) Prof. Friedman's expert declaration establishes that "in book form" is limited to the print media. (SOF ¶¶ 9, 51.) Harper submitted no expert report seeking to rebut this construction of publishing trade usage. Hence, the record contains unrebutted evidence that "in book form" is limited to print media, and Profs. Van Dam and Farber agree that print media are separate and distinct from digital media. (SOF ¶¶ 49-52.)

Ms. George believed she retained the e-book rights to *Julie of the Wolves*. (SOF ¶ 64.) Having obtained legal advice to the same effect, Open Road offered a 50% royalty for e-book publication. (SOF ¶ 65.) The agent, Ginger Knowlton, then contacted Harper and stated that while Ms. George retained the e-book rights and received an offer to publish *Julie of the Wolves* as an e-book, she and Ms. George would prefer to deal with Harper because of their long association. (SOF ¶¶ 66-68.)

Harper responded that it owned the e-book publication rights (SOF ¶ 71), expressed a desire to publish the work as an e-book (for the first time ever (SOF ¶ 67)), but insisted it would not pay any more than a 25% royalty. (SOF ¶¶ 68-70.) Harper dictated that Ms. George either take Harper's offer for half of what Open Road offered her, or receive no payment at all and deprive the marketplace of an e-book version of this children's classic. (SOF ¶¶ 69-73.)

Ms. George found Harper's position unacceptable (SOF ¶¶ 70, 72), and contracted with Open Road for a 50% royalty. (SOF ¶ 74.) Open Road announced its e-book publication of *Julie of Wolves* in August 2011 (SOF ¶ 75) and came to market with the e-book shortly thereafter.

Harper filed suit on December 24, 2011, claiming that Paragraphs 1 ("in book form") and 20 ("storage and retrieval and information systems") of the 1971 contract were grants of exclusive e-book publishing rights. (SOF ¶ 76.) Harper concedes that Paragraph 20 is not an express right of publication and seeks to imply such a right. (SOF ¶ 18.)

Ms. George died unexpectedly in mid-May 2012, four and one half months after suit was filed. (SOF ¶ 3.) While age 93, she had been vigorous and in seeming good health, and for that reason her deposition had not been taken in those intervening months. Her views about her 1971 contract were memorialized in a press release she authorized and statements she made to her daughter, Twig George, and to her literary agent, Ginger Knowlton. (SOF ¶¶ 11, 64, 72, 76-79.)

### III.   ARGUMENT

#### A.   The Legal Standards

##### 1.  The Standard for Summary Judgment

This copyright case turns on the interpretation of the 1971 contract between Harper and Ms. George, to determine whether she conveyed to Harper exclusive e-book publication rights. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Court may grant summary judgment if it determines the provision at issue is not ambiguous when viewed with knowledge of industry trade usage. It is only ambiguous "if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Sayers v. Rochester Tel. Corp.,* 7 F.3d 1091, 1095 (2d Cir. 1993) (citations omitted), *quoted in Weeks Marine, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n*, 2011 U.S. Dist. LEXIS 95358, at *24 (S.D.N.Y. Aug. 25, 2011), *aff'd*, 2013 U.S. App. LEXIS 2252 (2d Cir. Feb. 1, 2013). "'Where the contract is clear and unambiguous on its face, the courts must determine the intent of the parties from within the four corners of the instrument,'" but "where a contract is ambiguous, 'extrinsic evidence may be considered to ascertain the correct and intended meaning of a term.'" *Weeks Marine*, 2011 U.S. Dist. LEXIS 95358, at *23 (citations omitted).

Summary judgment may be granted "'when the language is ambiguous and there is relevant extrinsic evidence, but the extrinsic evidence creates no genuine issue of material fact and permits interpretation of the agreement as a matter of law'" or where "the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the

language." *Compagnie Financiere de CIC et de L'Union Europienne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000)(citations omitted).

### 2.   The Standard for "New Use" Cases

This case may be considered a "new use" copyright action because it presents the issue of whether a contract made decades ago confers rights in new technology, in this case e-book publishing rights. The Second Circuit addressed the procedure for analyzing new use cases in three cases. *Bartsch v. Metro-Goldwyn-Mayer, Inc.*, 391 F.2d 150 (2d Cir. 1968), involved the issue of whether a 1930 grant of motion picture rights to a play also conveyed the right to broadcast that motion picture on television 28 years later. *Bourne v. Walt Disney Co.,* 68 F.3d 621 (2d Cir. 1995), and *Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481 (2d Cir. 1998), both involved the issue of whether conveyance of the right to use a musical composition in a motion picture extended to videocassette distribution.

New use cases are, first and last, contract disputes and therefore courts must apply neutral principles of contract interpretation to the question of whether a contract covers the new use. *Boosey,* 145 F.3d at 487. Courts may not "adopt a default rule in favor of copyright licensees or any default rule whatsoever." *Id.* Instead, "[i]f the contract is more reasonably read to convey one meaning, the party benefitted by that reading should be able to rely on it." *Id.* The issue is one to be decided under applicable state contract law, not the federal common law of contracts. *Bartsch,* 391 F.2d at 153. In this case, the 1971 contract specifies New York law (Boni Decl. Ex. 7, ¶ 27), as did *Rosetta Books,* discussed in Section III.B below, where Judge Stein applied the new use case law and concluded that language similar to that relied upon Harper in this case did not grant e-book publication rights.

"New use" analysis involves two analytical steps, both of which must be satisfied before the new use will be deemed conveyed from the grantor (here Ms. George) to the claimed grantee

(here Harper). First, the court must determine whether the grant language on its face encompasses the new use: whether the new use "may reasonably be said to fall within the medium as described in the license." *Bartsch,* 391 F.2d at 155; *Boosey,* 145 F.3d at 486-87. If so, step two requires the court to determine that the new use was sufficiently commercially developed at the time of the grant to make it reasonably foreseeable by the parties to the contract. *See Bartsch,* 391 F.2d at 154 ("New York will not charge a grantor with the duty of expressly saving television rights when he could not know of the invention's existence. . ."). *Boosey* framed step two as "the foreseeability of the new channels of distribution at the time of contracting" and whether "a nascent market" for the new use existed at the time of the original contract. 145 F.3d at 486. *Bourne* asked whether "the possibility [to] market" the new use was recognized at the time "by persons knowledgeable in the entertainment and motion picture industries." 68 F.3d at 630. In all three cases, the grant was found to be extremely broad and unrestricted, and the new use was found to be commercially foreseeable at the time the grant was made.

As to the first prong, the Second Circuit in *Bartsch* affirmed a bench trial ending in a judgment for the defendant licensee, where the language granted the right "to copyright, vend, license and exhibit such motion picture photoplays throughout the world; together with the further sole and exclusive rights by mechanical and/or electrical means to record, reproduce and transmit sound, including spoken words . . . ." 391 F.2d at 151. The court held that "'[e]xhibit' means to 'display' or to 'show' by any method and nothing in the rest of the grant sufficiently reveals a contrary intention." *Id.* at 154. The court held that the words granted "were well designed to give the assignee the broadest rights with respect to its copyrighted property." *Id.*

In *Bourne,* there were two extremely broad grants, one that conveyed the "right to mechanically and/or electrically record the said musical compositions . . . in synchronism with *any and all of the motion pictures which may be made* by" the licensee, and a second which granted "the right to record such music mechanically *in any and all other motion pictures to be produced* by" the licensee. 68 F.3d at 624-25 (emphasis supplied). In affirming a jury verdict for the licensee, the Second Circuit again looked at the grants' broad wording, coupled with the Copyright Act's history in which a Senate Report stated that "the physical form in which the motion picture is fixed—film, tape, discs, and so forth—is irrelevant." *Id.* at 630.

*Boosey* similarly involved extremely broad grant language that granted the right "to record [the composition] *in any manner, medium or form*" for use "in [a] motion picture," which the Second Circuit held "is broad enough to include distribution of the motion picture in video format." 145 F.3d at 486 (emphasis supplied). The court explained that "[t]he license 'to record in *any manner, medium or form*' doubtless extends to videocassette recordings and we can see no reason why the grant of 'motion picture' reproduction rights should not include the video format, absent any indication in the Agreement to the contrary." *Id.* (emphasis added).

In all three cases, the court also found that the new use was commercially foreseeable at the time of the initial grant. In *Bartsch*, "future possibilities of television were recognized by knowledgeable people in the entertainment and motion picture industries" when the contract was entered into, contractual language frequently contained "an express grant of television rights," and Mr. Bartsch was an "experienced businessman" who had "reason to know of the new medium's potential." 391 F.2d at 154. In *Bourne*, the licensee showed when the licenses were executed, the possibility that it "could market its motion pictures for home viewing was recognized by persons knowledgeable in the entertainment and motion picture industries." 68

10

F.3d at 630. Similarly, in *Boosey*, the licensee "proffered unrefuted evidence that a nascent market for home viewing of feature films existed by 1939," which "compels the conclusion that the license for motion picture rights extends to video format distribution." 145 F.3d at 486.[2]

As we demonstrate below, neither prong of the new use analysis is satisfied in this case.

**B.      E-Books Are Not "In Book Form"**

**1.   *Rosetta Books* Compels Summary Judgment in Favor of Open Road**

Harper claims an exclusive right to publish e-books based upon the phrase "in book form" in its 1971 contract with Ms. George. This grant appears in ¶ 1 of the contract, and reads:

> 1.   The author hereby grants and assigns to the Publisher the exclusive right to publish in the English language in book form in the United States of America, its territories and possessions, and in Canada, a Work now entitled [*Julie of the Wolves*] . . . (SOF ¶ 8.)

In *Rosetta Books,* Judge Stein adjudicated the meaning of the same words upon which Harper relies. There, as here, an established print publisher (Random House) had signed contracts with prominent authors decades earlier, all of whom granted the right to publish the work "in book form" in paragraph 1 of each contract. There, as here, the authors contracted decades later with an e-book publisher, Rosetta Books, which published e-books whose texts were "identical to the text of the book published by Random House." 150 F. Supp. 2d at 617. There, as here, the publisher sued the e-book publisher for copyright infringement. Applying *Boosey* and *Bartsch,* Judge Stein held that the grant to publish "in book form" did not include e-books, *id.* at 620:

---

[2]  Harper has stated it intends to rely upon *Greenfield v Philles Records, Inc.*, 98 N.Y.2d 562, 780 N.E.2d 166 (2002).In that case, the court found there had been "an unconditional transfer of ownership rights to a work of art" that "include[d] the right to use the work in any manner," "coupled with the absence of a reservation clause." 780 N.E.2d at 171-72. In contrast, Ms. George conveyed only a limited grant to Harper, retained a number of copyright ownership interests in *Julie of the Wolves* (e.g., movie rights, sound recordings, performance rights), and benefited from a clear, broad reservation of rights provision.

Relying on "the language of the license contract and basic principles of interpretation," *Boosey,* 145 F.3d at 487 n.3, as instructed to do so by *Boosey* and *Bartsch,* this Court finds that the most reasonable interpretation of the grant in the contracts at issue to "print, publish and sell the work in book form" does not include the right to publish the work as an ebook.

Judge Stein examined the contracts, and found that the grant language of paragraph 1 "itself distinguishes between the pure content—i.e., 'the work'—and the format of display—'in book form.'" *Id.* In other words, only a limited "format of display" had been granted. Here, the contract has an identical grant structure, distinguishing between "the work" and "in book form."

The court then looked at how Random House's own online dictionary defined that format of display, i.e., how it defined "book" and "form." *Id.* A comparison shows that Harper's online American English Dictionary defines it just as did Random House's (SOF ¶ 14):

|      | **Random House**<br>(quoted at 150 F. Supp. 2d 620) | **Harper**<br>(www.collinsdictionary.com/dictionary) |
| --- | --- | --- |
| **Book** | "a written or printed work of fiction or nonfiction, usually on sheets of paper fastened or bound together within covers . . . " | "A number of sheets of paper, parchment, etc. with writing or printing on them, fastened together along one edge, usually between protective covers." |
| **Form** | "external appearance of a clearly defined area, as distinguished from color or material; the shape of a thing or person." | "the shape, outline, or configuration of anything; structure as apart from color, material, etc." |

Indeed, Harper's online dictionary re-emphasizes this critical distinction. It has a separate entry for "e-books," which it defines as: "the text of a book *in a digital form;* a portable electronic device with a video screen, for reading such text." (SOF ¶ 15.) Hence, "book form" and "digital form" are clearly distinguished as separate forms of publication.

Judge Stein then determined that the contracts granted specific rights for publication of different editions, specifically "book club editions, reprint editions, abridged forms and editions in Braille." *Id.* "This language would not be necessary if the phrase 'in book form' encompassed all types of books." *Id.* Here, Paragraph 19 grants Harper the right to "reprint the Work in whole

or in part," which would be superfluous if "in book form" covered every way the work could be presented to the public, including e-book presentation. (Boni Decl. Ex. 8, Friedman ¶ 18.)

The court then determined that, in each contract, the authors "reserved certain rights for themselves by striking out phrases, sentences and paragraphs of the publisher's form contract. This evidences a further intent by these authors not to grant the publisher the broadest rights in their works." *Id.* Similarly, here Ms. George and her agent struck numerous of Harper's pre-printed paragraphs, evidencing the same intent. (SOF ¶¶ 28-29.)

Judge Stein then determined that the words "in book form" were "understood in the publishing industry to be a limited grant." He quoted *Field v. True Comics,* 89 F. Supp. 611, 613-14 (S.D.N.Y. 1950), which held that the right "'to publish, print and market *in book form'*—especially when the author had specifically reserved rights for himself—was 'much more limited than the sole and exclusive right to publish, print and market *the book.*'" 150 F. Supp. 2d at 621-22. This trade usage understanding was buttressed by both *Nimmer on Copyright* and *Lindey on Entertainment, Publishing and the Arts*. *Id.* The Court also found support in declarations submitted by persons with decades of experience in the publishing industry (including Open Road's expert Prof. Leon Friedman), all of whom confirmed that "the publishing industry generally interprets the phrase 'in book form' as granting the publisher 'the exclusive right to publish a hardcover trade book in English for distribution in North America.'" *Id.* at 622.

Judge Stein explained why the Second Circuit "new use" cases were distinguishable. First, Judge Stein found that the language conveying the rights in those cases "was far broader than here." *Id.* Second, "the 'new use' in those cases—i.e., display of a motion picture on television or videocassette—fell squarely within the same medium as the original grant." *Id. Boosey,* for example, described videocassettes and laser discs as "subsequently developed

methods of distribution of a motion picture," *id.* (quoting 145 F.3d at 486), and *Bourne* relied

upon a Senate Report stating that whether a movie was displayed by "film, tape, discs and so

forth" was irrelevant to the definition of "motion picture," *id.* (quoting 68 F.3d at 630).

> In contrast, Judge Stein found:

> In this case, the "new use"—electronic signals sent over the internet—is a
> separate medium from the original use—printed words on paper. Random
> House's own expert concludes that the media are distinct because information
> stored digitally can be manipulated in ways that analog information cannot. (Van
> Dam Dep. at 29-30, 36, 42.)

*Id.* at 622. Prof. Van Dam, the Random House expert referenced above, is Harper's expert in the

present case. He unequivocally testified in *Rosetta Books*:

> Q.  Would you say that the computer is a different medium than a print book?

> A. It is. (SOF ¶ 49.)

Because of this critical difference, "*Boosey* and *Bartsch,* which apply to new uses within the

same medium, do not control this case." *Id*. at 623.

> Third, Judge Stein distinguished *Boosey and Bartsch* on the basis that, in those cases, the

"licensees in the motion picture cases have actually created a new work based on the material

from the licensor," and "[t]herefore, the right to display that new work—whether on television or

video—is derivative of the right to create that work." *Id.* at 623. In contrast, Judge Stein

explained that "[i]n the book publishing context, the publishers, although they participate in the

editorial process, display the words written by the author, not themselves." *Id.*

> Fourth, Judge Stein stated that both *Boosey* and *Bartsch* were concerned with the

potential for creating "antiprogressive incentives" where licensees would be "reluctant to explore

and utilize innovative technologies." *Id.* (quoting *Boosey,* 145 F.3d at 488 and citing *Bartsch,*

391 F.2d at 155). *Bartsch* explained that finding that the author retained the rights at issue would

create "the risk that a deadlock between the grantor and the grantee might prevent the work's

being shown over the new medium at all." 391 F.2d at 155. Judge Stein found that this was not a concern. 150 F. Supp. 2d at 623. Nor is it here. In both cases the e-books have come to market.[3]

Open Road urges that this Court follow Judge Stein's thoughtful analysis and reach the same conclusion. There are three compelling additional reasons for granting summary judgment to Open Road.

### 2.    Reservation of Rights Provision

Unlike those in *Rosetta Books*, Ms. George's 1971 contract contains an explicit reservation of rights provision:

> 14. All rights in the Work now existing, or which may hereafter come into existence, not specifically herein granted, are reserved to the Author for use at any time . . . .

(SOF ¶ 16.) Since "in book form" is a narrower grant than rights to "the work," Ms. George's contract unambiguously reserved to herself all rights to the work that may subsequently come into existence and all rights not specifically granted. E-book publishing subsequently (i.e., at least three decades later) came into existence and was not specifically granted. A court must give effect to every provision of a contract. *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 405 (2d Cir. 2009) ("a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect"); *Sayers,* 7 F.3d at 1095.

### 3.    Open Road's Expert Report on the Trade Usage of "In Book Form" Is Unrebutted and All Experts Agree Print and Digital Are Different Media

Open Road has submitted expert testimony as to the trade usage of the term "in book form" (SOF ¶ 9) and Harper has tendered no countervailing expert (or lay) declaration on this

---

[3]  If anything, a deadlock would be created if Harper were conferred the e-book publication right, because there is no royalty provision and because Ms. George should not be required to accede to Harper's non-negotiable 25% royalty. Harper thus espouses a scenario in which Ms. George must either accept Harper's royalty or the e-book market would be deprived of *Julie of the Wolves*. *Cf. Wood v. Lady Duff-Gordon*, 222 N.Y 88, 91, 118 N.E. 214, 214-15 (1917) (Cardozo, C.J.) (an exclusive license carries an implied promise by the licensee to use reasonable efforts to exploit the license). If Harper were to prevail, it would be in a position to lock up the rights in precisely this manner.

issue. Professor Friedman has extensive experience in the publishing industry: representing both publishing houses and authors; negotiating scores of publishing contracts; writing a treatise on book publishing contracts; and reviewing hundreds of publishing contracts for that treatise. He is clearly qualified as an expert on trade usage in the book publishing industry. He opines as follows on the trade usage of "in book form":

> [T]he grant of rights in the 1971 contract included the exclusive right to publish the work 'in book form.' That grant allowed the publisher to <u>publish</u> a book in various <u>print</u> forms—e.g. hardcover or "unbound sheets." That is why the royalty schedule in paragraph 7 of the contract is focused on the various print forms in which a book can be produced. It discusses "bound copies of the original edition" and "unbound sheets" (par. 7(c)). It also discusses a "cheap edition" (par. 7(e), which is the common, industry-used term to describe mass market paperback editions of the work. It also provides a royalty for books sold by a book club through a "plate royalty," that is, renting the printing plates from which the original edition was printed . . . . All of these words relate only to printed editions of the work, not any kind of electronic form. Thus the grant of exclusive rights to publish the work 'in book form' can only refer to a printed work.

(SOF ¶ 9.) Paragraphs 15-18 of his declaration further buttress this opinion. (*Id.*)

Moreover, all other experts in the case agree that e-book publication involves a different medium from print publication. Prof. Farber, Open Road's technology expert, concludes that: "In my opinion, e-books are of a different medium from the print medium. Its technology is different, one experiences it differently, and it has different potential." (SOF ¶ 50.) Prof. Van Dam, Harper's technology (and sole) expert, agrees (*see* p. 14 above). (SOF ¶ 49.)

The issue under prong one of the new use analysis is whether or not the new use "may reasonably be said to fall within the medium as described in the license." *Bartsch,* 391 F.2d at 155; *Boosey,* 145 F.3d at 486-87. With Prof. Friedman offering unrebutted expert testimony that "in book form" is limited to the print medium, and with Profs. Farber and Van Dam both agreeing that the digital medium and print medium are separate and distinct, the record here is

literally uncontradicted that the new use does *not* fall within the medium described in the license.[4]

### 4.   There Was No Nascent E-Book Market in 1971 (or 1981 or 1991)

Finally, the above meaning of "in book form" is relevant to prong one of the new use analysis. Judge Stein stopped at the first prong because he found that the grant to Random House was narrow, not broad, and did not cover e-books. Therefore, he did not have to reach prong two (whether there was a "nascent market" for e-books in 1971). If the Court reaches prong two, Open Road should still prevail on summary judgment.

Both Profs. Farber and Van Dam opine on this issue. Both are highly qualified and experienced in the field of computer science and technology. But their respective expert reports do not create a conflict for prong two analysis because Prof. Van Dam has addressed the wrong factual/legal standard. The issue is not whether a few isolated academic visionaries could dream of a day when the words of an author's work could be digitally transmitted through space. Rather, *Bartsch* required *actual knowledge* of the new invention by the grantor. *See* 391 F.2d at 154 ("New York will not charge a grantor with the duty of expressly saving television rights when he could not know of the invention's existence"). *Boosey* framed it as whether "a nascent market" for the new use existed at the time of the original contract. 145 F.3d at 486. *Bourne* required a showing that "the possibility [to] market" the new use was recognized at the time "by

---

[4]  Harper, seeking to play "gotcha," points to remarks that Jane Friedman, the President and CEO of Open Road, said in a panel discussion on the Charlie Rose show. She said: "What is the difference if a book is in hard bound or it's in paperback or it's in audio, which I think is a wonderful medium for listening to literature. And now the e format is just another format." (Boni Decl. Ex. 3 at 89:3-7.) This is thoroughly consistent with Judge Stein's analysis. An e-book is a different "form" or "format" from a print book, as all the experts, and even Harper's own dictionary, confirm. (SOF ¶¶ 14-15, 49-51.)

Harper also apparently seeks to rely upon a statement about e-books made by independent author Scott Spencer, who is not employed by Open Road, and which Open Road published on its website. As Ms. Friedman explained at her deposition, she disagrees with the statement. (Boni Decl. Ex. 3 at 84:2-5.) More to the point, actions speak louder than words. Mr. Spencer licensed his e-book publishing rights to Open Road, not his print publisher.

persons knowledgeable in the entertainment and motion picture industries." 68 F.3d at 630. In other words, the standard asks whether there was genuine *commercial* foreseeability. Whether one uses the words "nascent market" (*Boosey*) or "the "possibility [to] market" (*Bourne*), both are very different from academic musings. (*See* Boni Decl. Ex. 34 – Farber Rebuttal Report ¶¶ 3-5.)

Prof. Farber's report addressed the correct standard head-on, by explaining how five separate technologies had to converge before the possibility to market e-books could even appear on the horizon. (SOF ¶¶ 41-48.) "[T]hese technology developments did not begin to converge in the U.S. economy until the late 1980's at the earliest. In my opinion, until this convergence there could be no possible market for the electronic distribution of large texts such as books." (SOF ¶ 47.) Prof. Farber is describing a *potential* nascent market, not the existence of an actual commercial market. He points out that the actual development took far longer. Confirming this, Harper first inserted an electronic publishing grant in its contracts in 1989 (SOF ¶ 57) and first announced its intention to publish e-books in 2001 (SOF ¶ 61). There was no true commercial viability until the Kindle was brought to market by Amazon in 2007. (SOF ¶ 44.) Harper Children's Division Editor Kate Jackson testified that December 2010 was still "very early" in the market for e-books. (SOF ¶ 63.)

Harper does not contradict Prof. Farber, and does not address these five technologies and their convergence. Instead, Paragraphs 23-37 of Prof. Van Dam's declaration are limited to discussion of a handful of academic research experiments and several visionary statements by computer experts. There is no discussion at all of the kind of commercial foreseeability that *Bartsch, Boosey,* and *Bourne* require. Hence, there is no genuine dispute under the prong two analysis, and summary judgment should be granted to Open Road.

For the above reasons, summary judgment should be granted to Open Road on whether the clause "in book form" conveyed to Harper exclusive e-book publishing rights. It did not.

### C.    Paragraph 20 Does Not Convey E-book Publication Rights

#### 1.    Paragraph 20 Does Not Include Any Publication Grant

Harper also argues that Paragraph 20 of the contract grants to it exclusive e-book publishing rights. It reads:

> 20. Anything to the contrary herein notwithstanding, the Publisher shall grant no license without the prior written consent of the Author with respect to the following rights in the work: use thereof in storage and retrieval and information systems, and/or whether through computer, computer-stored, mechanical or other electronic means now known or hereafter invented and ephemeral screen flashing or reproduction thereof, whether by print-out, phot [sic] reproduction or photo copy, including punch cards, microfilm, magnetic tapes or like processes attaining similar results, and net proceeds thereof shall be divided 50% to the Author and 50% to the Publisher. However, such license shall not be deemed keeping the work in print once the work has gone out of print in all editions.

(SOF ¶ 23.) This paragraph does not contain any terminology that could be construed to grant the right to publish editions of *Julie of the Wolves* as an e-book. By its terms, this paragraph speaks only to licensing the work for use in information storage and retrieval systems (which, as discussed in Section III.C.3, below, are databases and indexing tools, not e-books) by third parties with the consent of the author.

Additionally, this paragraph gives the author the right to veto the entity to which Harper could license the work for such uses. No such right exists with respect to any other means of offering the entire work to the public. It would be anomalous to allow an author to veto an exclusive publishing right that the author granted the publisher in the same work. (SOF ¶ 26.)

19

**2.    Harper's Strained Construction of Paragraph 20 Would Render it Unenforceable Under New York Contract Law**

Assuming *arguendo* Paragraph 20 could somehow be construed to grant to Harper the right to publish an e-book, as Harper claims, it would be unenforceable under New York law for lack of an essential term. "'The consideration to be paid under a contract is a material term.'" *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 125 (S.D.N.Y. 2010) (applying New York law). It is undisputed there is no royalty provision in Paragraph 20 covering e-books. (SOF ¶ 22.)[5] The absence of a defined royalty term in Paragraph 20 renders the claim unenforceable. When the material term for payment, or consideration, is missing, the claim fails:

> [D]efiniteness as to material matters is of the very essence in contract law. Impenetrable vagueness and uncertainty will not do. . . . Dictated by these principles, it is rightfully well settled in the common law of contracts in this State that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable.

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109-10, 417 N.E.2d 541, 543-44 (1981). To be enforceable, a contract must at a minimum specify "a methodology for determining" the payment amount, or must reference "an objective extrinsic event, condition or standard on which the amount was made to depend." *Id.* There is nothing like that here.

By its plain language Paragraph 20 cannot be construed to convey any publication rights to Harper. The Court would have to rewrite the provision not only to include publication grant language, but also to devise and impose a royalty term, which too is absent from Paragraph 20. Harper's witnesses admitted such terms are "implied" in the provision. (SOF ¶ 18.) "The courts may not by construction add or excise terms, nor distort the meaning of those used and thereby

---

[5]  Paragraph 20 provides that if Harper licenses the uses describe therein to third parties, net proceeds of that licensing revenue are to be split 50/50 between Harper and Ms. George. This is not a royalty for any publication of the work *by Harper*. If Harper argues that this could be considered a royalty term, Harper committed a material breach of Paragraph 20 by refusing Ms. George's demand for that amount. (SOF ¶¶ 68-74.) This excused Ms. George from any further performance. "When one party commits a material breach of a contract, the other party to the contract is relieved, or excused, from further performance under the contract." *Markham Gardens L.P. v. 511 9th LLC*, 954 N.Y.S.2d 811, 815 (Sup. Ct. 2012) (citing *Grace v. Nappa*, 46 N.Y.2d 560, 389 N.E.2d 107 (1979)).

'make a new contract for the parties under the guise of interpreting the writing.'" *Morlee Sales Corp. v. Mfrs. Trust Co*., 9 N.Y.2d 16, 19, 172 N.E.2d 280, 282 (1961) (citations omitted).

### 3.    Under the New Use Analysis, Paragraph 20 Cannot Be Construed to Encompass E-Books

Harper's claim also fails under both prongs of the new use analysis. Its interpretation requires the Court to rip the following words in Paragraph 20 out of context and consider them in isolation: "computer, computer-stored" and "electronic means now known or hereafter invented." (This is how its expert's analysis proceeds). However, "contract provisions are not to be construed out of context and in isolation." *Gen. Motors Acceptance Corp. v. Berg & Duffy*, 460 N.Y.S.2d 899, 901 (Sup. Ct. 1983). Those words pertain only to "storage and retrieval and information systems" and cannot possibly be read to serve as stand-alone publication grants.

Further, Harper claims that a grant of rights in information storage and retrieval systems is tantamount to a grant of e-book publication rights. That claim, however, does not pass muster under prong one of the new use analysis, because e-books and information storage and retrieval systems are apples and oranges. In the words of *Bartsch,* 391 F.2d at 15, e-books are not "the medium as described in the license" of Paragraph 20.

The meaning of "information, storage and retrieval systems" from the 1960's to the present is described in Prof. Farber's report and rebuttal report, and in the many books and publications he references. All buttress his opinion that Paragraph 20 of the contract "is describing systems in which books and other publications would be analyzed, indexed, classified, and abstracted, including by computers." (SOF ¶ 36, Farber ¶ 18.) It is not a grant from the author of a right of electronic publication.

Beginning in the mid-1960's (when Curtis Brown first inserted this clause in the contracts it negotiated for its authors) (SOF ¶ 30), people were beginning to foresee using

computers to analyze and search for information about books, essentially a far more sophisticated manner of retrieving information than the traditional Library of Congress card catalogue system. Curtis Brown wanted the authors to share in the proceeds if such a market for storage and retrieval systems actually did develop.

A succinct description of the purpose of these systems is as follows:

An information retrieval system does not inform (i.e. change the knowledge of) the user on the subject of his inquiry. It merely informs on the existence (or non-existence) and whereabouts of documents relating to his request.

Rijsbergen et al., *Information Retrieval* (2d ed. 1979), *at* http://dcs.gla.ac.uk/Keith/Preface.html.[6]

As Prof. Farber explains, none of the literature on information storage and retrieval systems concerns e-books or indeed publication rights of any kind. The volume Ms. Bates edited (no. 7 in n.6, above), was published in 2012. It is 711 pages in length. 71 authors contributed to it. The index to the book for the letter "E," shows numerous references to electronic subjects (e.g., "E-commerce sites," "Electronic bulletin boards," "E-mail, owner of," "E-rights"), *but this exhaustive treatise lacks a single mention of "e-books" or "electronic books*." If Harper's contention were true—that a 1971 clause relating to "storage and retrieval and information systems" conferred the rights to e-book publication—this would not plausibly have occurred.

Confirmation that e-books and information storage and retrieval systems are apples and oranges is found in Harper's own subsequent conduct. In 1993 and 1994, Harper included

---

[6] Prof. Farber also cites in support of his opinion, among other things: (1) a seminal college textbook, *Information Storage and Retrieval: Tools, Elements, Theories,* by Becker and Hayes (1963 and 1967); (2) the 1968 article by Professor Prywes of the University of Pennsylvania, titled "Online Information Storage and Retrieval," available at http://repository.upenn.edu/cis_reports/823; (3) "Classification in Information Storage and Retrieval," by O.E. Taulbee in *Proceedings of the 1965 20th Annual Conference, Association of Computing Machinery,* available at dl.acm.org/citation.cfm?id=806038; (4) "Modern Information Retrieval: A Brief Overview," by Amit Singhal in *Bulletin of the IEEE Computer Society Technical Committee on Data Engineering* (2001), available at http://singhal.info/ieee2001.pdf; (5) *Information Retrieval Today,* by F. Wilfrid Lancaster (1993); (6) "Introduction to Web Search Engines and a Short History of Information Retrieval," in *Google's PageRank and Beyond: the Science of Search Engine Rankings,* by Langville and Meyer (2006); and (7) *Understanding Information Retrieval Systems, Management, Types, Standards* (Marcia Bates ed. (2012).

explicit electronic rights provisions in its standard form contracts and starkly differentiated e-books from information storage and retrieval systems as follows:

> ¶ 8(a)(13): the right to record and transmit the verbatim text of the Work or parts of the Work by any means, electronic or otherwise, the result of which serving as a substitute for sales of the Work in book form.

(SOF ¶¶ 55, 57-59; *see also* Friedman ¶ 20.) That grant is separate and distinct from the next provision:

> ¶ 8(a)(14): the inclusion of the Work in information storage and retrieval systems or databases and the software adaptation of the work.

(SOF ¶ 55.) Harper considered them to be two separate and unrelated rights, and two separate and unrelated grants. Indeed, it characterized these rights with distinct verbs: "record and transmit" when referring to e-book publishing, and "inclusion" when referring to the use in information storage and retrieval systems. Harper cannot reasonably argue it now believes there is no difference between e-books and information storage and retrieval systems, in light of its own differentiation of the two technologies in its earlier contracts.

Prof. Van Dam's expert declaration does not create a disputed issue, i.e., a genuine objective ambiguity as to prong one analysis, because he fails to address the industry and trade usage of "information storage and retrieval systems." Only a few paragraphs even purport to address it. Paragraphs 13-22 proceed on the flawed premise that a handful of words ("computer . . . electronic means") do not modify "information and storage and retrieval systems" and therefore can be considered in isolation. This fallacy has been addressed above. Paragraphs 20-22 simply opine about what the words *could* mean ("a text of the book *Julie of the Wolves* is initially stored 'in the cloud' and then retrieved by users of that device") without reference to how *the industry* has actually defined "information storage and retrieval systems" continuously from the 1960's to the present. This is not the standard for contract construction,

which requires an analysis by one who is "cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Sayers,* 7 F.3d at 1095; *see also Rosetta Books*, 283 F.3d at 491-92; *Rosetta Books*, 150 F. Supp. 2d at 618. Paragraphs 28-29 describe how Prof. Van Dam now characterizes his own academic research at Brown University, without objective evidence it was ever referred to this way by children's book authors, the book publishing industry or by anyone else.

Paragraph 33 is the sole paragraph that references actual publications that use words close to the words at issue. He cites two publications. The first is "Remote text access in a computerized library information retrieval system," a paper delivered at a 1969 computer conference. It examines different methods for placing materials into an experimental database, and states in its first paragraph: "The Intrex system will permit experimentation with the complete *machine-aided library operation.*" (emphasis supplied). That is completely consistent with Prof. Farber's opinion. The second publication is Ramey, *Copyright Labyrinth: Information Storage and Retrieval Systems,* 17 Copyright L. Symp. 1, 2 (1969), a law review article analyzing whether information storage and retrieval systems could potentially infringe copyrights, and whether the "fair use" doctrine of copyright law applies. Neither of these publications, nor anything else in Prof. Van Dam's opinion, creates a genuine disputed issue when ranged against the multitude of books, journal articles and papers cited by Prof. Farber. This is not an issue of the weight of the evidence or credibility, but rather that, objectively viewed, the two publications Prof. Van Dam cites do not create a conflict with Prof. Farber's opinion about the accepted trade usage of information storage and retrieval system from the 1960's to the present.[7]

---

[7]  If the Court proceeds to prong two of the new use analysis, Prof. Van Dam's declaration does not create a disputed issue as to whether a nascent e-book market existed in 1971, for reasons explained on pp. 17-18 above.

### 4.    Paragraph 20 Is Like the Photocopy Clauses in *Rosetta Books*

Paragraph 20 also contains language that refers to various methods of photocopying and storing the text in microfilm and similar technologies. In *Rosetta Books*, Judge Stein was confronted with similar clauses that granted Random House rights for "photographing, recording, and microfilming," "microfilming, Xerox and other forms of copying," and "Xerox and other forms of copying of the printed page, either now in use or hereafter developed." 150 F. Supp. 2d at 615-17.

Judge Stein rejected the argument that such clauses could be construed to encompass e-book publishing, explaining: "Although the clause does appear in the grant language paragraph [unlike Paragraph 20], taken in context, it clearly refers only to new developments in xerography and other forms of photocopying. Stretching it to include new forms of publishing, such as ebooks, would make the rest of the contract superfluous because there would be no reason for authors to reserve rights to forms of publishing 'now in use.'" *Id.* at 621. Just so, the "other electronic means now known or hereafter invented" clearly refers only to new developments in storage and retrieval systems, and neither the storage and retrieval nor the photocopy clauses in Paragraph 20 can be read to encompass e-book publishing.

## IV.    CONCLUSION

For the foregoing reasons, summary judgment should be granted to Open Road.

Dated: March 18, 2013

Respectfully submitted,

/s/ Michael J. Boni
Michael J. Boni (*Pro Hac Vice*)
John E. Sindoni (*Pro Hac Vice* pending)
BONI & ZACK LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel. (610) 822-0200
Fax (610) 822-0206

Email: MBoni@bonizack.com
      JSindoni@bonizack.com

Robert J. LaRocca (*Pro Hac Vice* pending)
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Tel: (215) 238-1700
Fax: (215) 238-1968
Email: rlarocca@kohnswift.com

Robert F. Levine (RFL-3918)
Kim G. Schefler (KGS-4912)
LEVINE PLOTKIN & MENIN LLP
1740 Broadway, 22nd Floor
New York, NY 10019
Tel: (212) 245-6565
Email: rlevine@lpmny.com
      kschefler@lpmny.com

*Attorneys for Defendant*
*Open Road Integrated Media, Inc.*

26