UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
HARPERCOLLINS PUBLISHERS LLC,

                Plaintiff,

      - against -

OPEN ROAD INTEGRATED MEDIA, LLP,

                Defendant.
---------------------------------------X

**MEMORANDUM AND ORDER**

11 Civ. 9499 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff HarperCollins Publishers LLC ("HarperCollins") brings this action against defendant Open Road Integrated Media, LLP ("Open Road"), alleging willful infringement of HarperCollins' rights under federal copyright law to the well-known children's novel <u>Julie of the Wolves</u>. Open Road, a digital publisher who has issued an e-book version of <u>Julie of the Wolves</u>, counters that the operative contract, signed in 1971, does not convey exclusive electronic publication rights to HarperCollins. Now pending before the Court are the parties' cross-motions for summary judgment. For the reasons stated herein, this Court grants plaintiff's motion and denies defendant's motion.

## I.  Factual Allegations

The present dispute arises out of a publishing agreement (hereafter the "contract" or the "agreement") executed on April 13, 1971 by the author Jean George and the publishing house Harper & Row, plaintiff's predecessor in interest, which, broadly speaking, gave plaintiff the right to publish George's children's novel <u>Julie of the Wolves</u>.[2]  The novel was first published in hardcover format by Harper & Row in 1972.  Pl. R. 56.1 ¶ 13; Def. R. 56.1 ¶ 5.  It won the Newbury Medal in 1973

---

[1]  The facts recited here are drawn from the Complaint ("Compl."), filed December 23, 2011; Plaintiff's Memorandum of Law in Support of their Motion for Summary Judgment, filed March 18, 2013 ("Pl. Mem."); Plaintiff's Rule 56.1 Statement of Material Facts in Support of their Motion for Summary Judgment, filed March 18, 2013 ("Pl. R. 56.1"); the Declaration of Kate Jackson in Support of Plaintiff's Motion for Summary Judgment, filed March 18, 2013 ("Jackson Decl."); the Declaration of Andries Van Dam in Support of Plaintiff's Motion for Summary Judgment ("Van Dam Decl."), filed March 18, 2013, and the exhibits annexed thereto; the Declaration of R. Bruce Rich, Esq. in Support of Plaintiff's Motion for Summary Judgment ("Rich Decl."), filed March 18, 2013, and the exhibits annexed thereto; Defendant's Memorandum of Law in Support of their Motion for Summary Judgment, filed March 18, 2013 ("Def. Mem."); Defendant's Rule 56.1 Statement of Material Facts in Support of their Motion for Summary Judgment, filed March 18, 2013 ("Def. R. 56.1"); the Declaration of Michael J. Boni, Esq. in Support of Defendant's Motion for Summary Judgment ("Boni Decl."); filed March 18, 2013, and the exhibits annexed thereto; Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, filed April 4, 2013 ("Pl. Opp."); Plaintiff's Response to Defendant's Rule 56.1 Statement, filed April 4, 2013 ("Pl. R. 56.1 Ctr. Stmt."); the Declaration of Mark J. Fiore, Esq. in Opposition to Defendant's Motion for Summary Judgment, filed April 4, 2013 ("Fiore Decl."); Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment, filed April 4, 2013 ("Def. Opp."); Defendant's Response to Plaintiff's Rule 56.1 Statement, filed April 4, 2013 ("Def. R. 56.1 Ctr. Stmt."); the Supplemental Declaration of Michael J. Boni, Esq. in Opposition to Plaintiff's Motion for Summary Judgment, filed April 4, 2013 ("Boni Opp. Decl."); and supplemental letter briefing submitted by plaintiff on November 13, 2013 and December 2, 2013 ("Pl. Supp.") and supplemental letter briefing submitted by defendant on November 20, 2013 ("Def. Supp."), as well as the exhibits annexed thereto.

[2]  The contract has been submitted as Ex. 1 to the Rich Decl. and Ex. 7 to the Boni Decl.

for the most distinguished contribution to children's literature and was a finalist for the 1973 National Book Award. Pl. R. 56.1 ¶ 13; Def. R. 56.1 ¶ 6. Between 1972 and December 2011, HarperCollins sold more than 3.8 million units of the novel in hardcover and paperback, among other formats. Pl. R. 56.1 ¶ 14; Def. R. 56.1 ¶ 7. Then and in the years since, Julie of the Wolves has been considered a celebrated title in children's literature. Pl. R. 56.1 ¶ 13; Def. R. 56.1 ¶ 6.

By the 1971 contract, Ms. George conveyed publishing rights to HarperCollins to publish Julie of the Wolves in exchange for a $2,000 advance and royalty payments of between ten and fifteen percent, depending on number of copies sold. Contract ¶¶ 1, 7. The contract contemplated the sale of paperback editions ("cheap edition") but did not specify the royalty rate for paperbacks, instead indicating that the publisher would pay a paperback royalty "to be mutually agreed." Contract ¶ 7.

The contract contains several clauses critical to the outcome of this suit. Paragraph 1 of the agreement grants to HarperCollins "the exclusive right to publish" Julie of the Wolves "in book form" in the English language and within specified territory. Contract ¶ 1. In addition to this broad grant language, the contract provided in a paragraph entitled "Disposition of Subsidiary Rights" that "[i]t is understood and agreed that the Publisher shall have the exclusive right to

sell, lease or make other disposition of the subsidiary rights in which he has an interest under the terms of clause (subject to the 'consultation' provision in 7f) 19 and 20." Contract ¶ 23.

Paragraph 20, in turn, makes the following provision:

Anything to the contrary herein notwithstanding, the Publisher shall grant no license without the prior written consent of the Author with respect to the following rights in the work: **_use thereof in storage and retrieval and information systems, and/or whether through computer, computer-stored, mechanical or other electronic means now known or hereafter invented_** and ephemeral screen flashing or reproduction thereof, whether by print-out, phot[o] reproduction or photo copy, including punch cards, microfilm, magnetic tapes or like processes attaining similar results, and net proceeds thereof shall be divided 50% to the Author and 50% to the Publisher. However, such license shall not be deemed keeping the work in print once the work has gone out of print in all editions." (emphasis added)

This clause was inserted at the request of Ms. George's literary agency, Curtis Brown, which negotiated the contract on the author's behalf. Pl. R. 56.1 ¶ 38; Def. R. 56.1 ¶ 28. The language of Paragraph 20 was drafted by Curtis Brown in 1967 and was apparently standard in contracts negotiated by Curtis Brown with American publishers. Pl. R. 56.1 ¶ 39. In fact, identical language was included in at least six contracts between Ms. George and Harper & Row that predate the operative contract in the instant matter. Pl. Opp. at 7-8; Def. R. 56.1 ¶ 31; Boni Decl. Ex. 19-24. In eight subsequent contracts between Ms. George and HarperCollins, the words "and/or" were deleted, such

that the relevant language read "use thereof in storage and retrieval systems, whether through computer, mechanical, or other electronic means now known or hereafter invented . . . ." Def. Mem. at 4, n.1; Def. R. 56.1 ¶ 32; Boni Decl. Ex. 26, 28-32.[3]

In addition to these critical clauses, the contract also contained other paragraphs pertinent to this action, including Paragraph 19, which gave the Publisher the right "to reprint the said Work in whole or in part in the form of excerpts, digests and selections in one or more issues of a newspaper, magazine, book or anthology," with revenues generally divided evenly between author and publisher. Contract ¶ 19. The contract also contained a "Reserved Rights" clause that reserved to the author "[a]ll rights in the Work now existing, or which may hereafter come into existence, not specifically herein granted," including motion picture rights. Contract ¶ 14. The contract provided for a New York choice of law. Contract ¶ 27.

In the decades that followed, the parties apparently coordinated with regard to the use of the work by third parties in electronic formats. Repeatedly in recent years, HarperCollins forwarded requests to Ms. George "[p]er our agreement," to use text from Julie of the Wolves in CD-Roms,

---

[3]    The language differed among the parties' subsequent contracts, with some omitting the crucial "now known or hereafter invented" clause. See Boni Decl. Ex. 25, 27.

online teaching materials, online examination materials and the like, including in August 1998 a request to include Julie of the Wolves in a test of an early e-book reading device. See Pl. R. 56.1 ¶¶ 19-23; Rich Decl. Ex. 13-16; Def. Supp. Ex. B. The record before us indicates that Ms. George generally agreed to these requests, sometimes after negotiating a more favorable royalty. Pl. R. 56.1 ¶¶ 19-23; Rich Decl. Ex. 13-16. The parties disagree, however, on the implication to be taken from these communications regarding third-party uses. HarperCollins asserts that this course of performance was undertaken pursuant to the requirements of Paragraph 20. Pl. Mem. at 7-8. Open Road contends that these uses fell under the "permissions" provision set forth in Paragraph 19; and further notes that Ms. George unilaterally granted electronic rights to the Work without HarperCollins's involvement (but apparently also without HarperCollins knowledge or consent). Def. Opp. at 18-20; Tr. at 15.

The events immediately precipitating this lawsuit began in 2010, nearly forty years after the execution of the operative contract, at which point the publishing world featured an e-book market. E-book technology enables the full text of a book to be presented in digital form, to be read on a computer or portable electronic device, such as a dedicated e-book reader, a smart phone, or a pad/tablet. Pl. R. 56.1 ¶¶ 44-45; Def. R. 56.1 ¶

15.    Defendant Open Road is an e-book publisher and multimedia content company established in 2009.  Def. R. 56.1 ¶ 2.

In 2010, Open Road approached Ms. George's literary agent Curtis Brown with a proposal to publish an e-book edition of Julie of the Wolves in exchange for a 50% royalty to Ms. George. Pl. R. 56.1 ¶ 80; Def. R. 56.1 ¶ 65.   Preferring initially to pursue an e-book publication with her longtime publisher HarperCollins, Ms. George authorized her agent to contact HarperCollins and suggest the e-book publication, with the proviso that HarperCollins match Open Road's 50% royalty offer. Def. R. 56.1 ¶ 67.    HarperCollins expressed interest in electronic publication; however, they counter-offered only a 25% royalty.   Pl. R. 56.1 ¶ 84; Def. R. 56.1 ¶ 69.  Dissatisfied with that offer and expressing her belief that she – not HarperCollins – owned the e-book rights, Ms. George instead contracted in April 2011 with Open Road to publish Julie of the Wolves as an e-book.  Def. R. 56.1 ¶¶ 70, 74.  Before doing so, Ms. George entered an agreement with Open Road, by which the electronic publisher agreed to indemnify Ms. George in the event HarperCollins asserted a claim against the author.  Pl. R. 56.1 ¶ 85.  Open Road subsequently distributed Julie of the Wolves as an e-book via a number of distribution channels; between October 2011 and March 2012, approximately 1,600 such e-book copies were sold.  Pl. R. 56.1 ¶¶ 86, 88.

Plaintiff HarperCollins filed suit against Open Road on December 23, 2011, alleging willful copyright infringement in violation of 17 U.S.C. § 106 and seeking injunctive relief, statutory or actual damages at its election, and the recovery of Open Road's profits and HarperCollins' costs. Compl. ¶¶ 31-34. Defendant answered on February 16, 2012 and discovery followed. After briefing of the instant cross-motions was completed, oral argument was held on January 30, 2014.

**DISCUSSION**

## II.  Standard of Review

A motion for summary judgment is appropriately granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).  In this context, "[a] fact is 'material' when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks and citations omitted).  "In assessing the record to determine whether there is [such] a genuine issue [of material fact] to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  Gorzynski v. JetBlue Airways Corp., 596 F.3d 93,

101 (2d Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). On a motion for summary judgment, "[t]he moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

Where that burden is carried, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Id. (citing Anderson, 477 U.S. at 249). To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted). The nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly and Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted); see also BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir. 1996) (it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts") (internal citations and quotation marks omitted).

When cross-motions for summary judgment are made, as here, the standard is the same as that for individual motions for summary judgment. Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir.2001). Each motion must be considered independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party. Id.

## III. Principles of Contract Interpretation in the Copyright Context

To maintain an action for copyright infringement, plaintiff must establish two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Kwan v. Schlein, 634 F.3d 224, 229 (2d Cir. 2011) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361 (1991). In the case sub judice, the parties dispute only the first element – that is, whether HarperCollins' uncontested publication rights to Julie of the Wolves encompass the exclusive right to publish and license e-book versions of the work. See Pl. Mem. at 11-12; Def. Mem at 7. Copyright infringement actions such as this "involving only the scope of the alleged infringer's license present the court with a question that essentially is one of contract: whether the parties' license agreement encompasses the [relevant] activities." Bourne v. Walt Disney Co., 68 F.3d 621, 631 (2d

Cir. 1995). This case thus turns on the construction of the governing 1971 contract between author Jean George and publisher HarperCollins.

Pursuant to New York law, the interpretation of an unambiguous contract is a question of law to be addressed by the Court. See Provident Loan Soc'y of N.Y. v. 190 E. 72nd St. Corp., 911 N.Y.S.2d 308, 309 (1st Dep't 2010). So too is the determination of whether a contract provision is in fact ambiguous. Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 178 (2d Cir. 2004) (quoting W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162 (1990)). A contract is ambiguous only if "the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." Goldman Sachs Grp., Inc. v. Almah LLC, 924 N.Y.S.2d 87, 90 (1st Dep't 2011) (internal citation and quotation marks omitted); see also Broder v. Cablevision Sys. Corp., 418 F.3d 187, 197 (2d Cir. 2005) ("[A]mbiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and . . . is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." (internal citation and quotation marks omitted)).

In determining the meaning of a contract, this Court will "look to all corners of the document rather than view sentences or clauses in isolation." Int'l Klafter Co. v. Cont'l Cas. Co., 869 F.2d 96, 99 (2d Cir. 1989) (internal quotation marks omitted); see also Kass v. Kass, 91 N.Y.2d 554, 566 (1998). "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." W.W.W. Assocs., Inc., 77 N.Y.2d at 162. In other words, our "primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." Bolt Elec., Inc. v. City of New York, 223 F.3d 146, 150 (2d Cir. 2000).

## IV. New Use Precedent

In accord with these principles of contract construction, the Second Circuit's "new use" precedent sets forth a procedure for evaluating whether a contract covers later-developed technology. This Court is guided by several leading cases, including Bartsch v. Metro-Goldwyn-Mayer, Inc., 391 F.2d 150 (2d Cir. 1968), Bourne v. Walt Disney Co., 68 F.3d 621 (2d Cir. 1995), and Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co., 145 F.3d 481 (2d Cir. 1998), all of which arise in the context of the motion picture industry. Bartsch posed the question of whether an earlier grant of motion picture rights to a play also comprised the right to broadcast that movie on

12

television 28 years later.  Bourne and Boosey considered whether the holder of a license to use a piece of music in a motion picture also had the right to use the music in distribution of the movie via videocassette over forty years later.  In these three cases, all of which evaluated contracts pursuant to New York law, the initial grant language was found to encompass the later-developed new use.

In a "new use" case, the Court must determine whether the new use "may reasonably be said to fall within the medium as described in the license."  Bartsch, 391 F.2d at 155.  The key interpretive principle to be applied is that the language of the contract itself governs.  Boosey, 145 F.3d at 487.

In construing the scope of the contractual grant, the Court must apply "neutral principles of contract interpretation" and avoid any "default rule in favor of copyright licensees or any default rule whatsoever."  Id.  As the Second Circuit instructs, "[i]f the contract is more reasonably read to convey one meaning, the party benefitted by that reading should be able to rely on it; the party seeking exception or deviation from the meaning reasonably conveyed by the words of the contract should bear the burden of negotiating for language that would express the limitation or deviation."  Id.

Indeed, in new use cases, the words of the contract may take on even greater significance than in a standard contract

action in which the Court could review contemporaneous extrinsic evidence to elucidate the intent of the parties. Partly, this is because "many years after formation of the contract, it may well be impossible to consult the principals or retrieve documentary evidence to ascertain the parties' intent, if any, with respect to new uses." Id. at 488. Bartsch describes the problem more bluntly: "With Bartsch dead, his grantors apparently so, and the Warner Brothers lawyer understandably having no recollection of the negotiation, any effort to reconstruct what the parties actually intended nearly forty years ago is doomed to failure." 391 F.2d at 155.

Moreover, by their very nature, new use cases create a significant obstacle to the use of extrinsic evidence. An inquiry into the parties' intent "is not likely to be helpful when the subject of the inquiry is something the parties were not thinking about." Boosey, 145 F.3d at 487-88. Likewise, extrinsic evidence of the parties' course of dealing or industry practice is likely irrelevant, "because the use in question was, by hypothesis, new, and could not have been the subject of prior negotiations or established practice." Id. at 488.

Thus, the leading cases discussed here placed primary emphasis on the contractual language. They also considered the "foreseeability" of the new use at the time of contracting, and found, respectively, that "future possibilities of television

were recognized by knowledgeable people in the entertainment and motion picture industries," Bartsch, 391 F.2d at 154; that "home viewing of motion pictures was within the contemplation of persons in the motion picture industry," Bourne, 68 F.3d at 630; and that "a nascent market for home viewing" existed at the time of contracting. Boosey, 145 F.3d at 486. Notably, however, and contrary to defendant's contention, the case law did not explicitly treat "foreseeability" of the new use at the time of contract as a sine qua non. Instead, whether foreseeability is required remains an open question. See Boosey, 145 F.3d at 486 (whether "a new-use license hinges on the foreseeability of the new channels of distribution at the time of contracting [was] a question left open in Bartsch").[4]

## V. Application

As an initial matter, we note that the parties have filed cross-motions for summary judgment. We agree with counsel's assessment that this action is well-suited to resolution upon summary judgment.

Based on a plain reading of the contractual language, we hold that the 1971 contract grants HarperCollins the exclusive

---

[4] Existing alongside the Second Circuit case law is certain New York state precedent holding that that licenses for television rights do not extend to videocassette distribution. Tele-Pac, Inc. v. Grainger, 570 N.Y.S.2d 521, 522 (1st Dep't 1991). In addressing this line of cases, the Second Circuit distinguished Tele-Pac and its ilk on the basis of the particulars of the contractual language, providing yet more reason for this Court to approach the grant language present here with special scrutiny. Bourne, 68 F.3d at 629-30.

right to license third parties to publish e-book versions of Julie of the Wolves.  This determination follows from the contract as a whole, and chiefly from Paragraphs 1, 20 and 23.

**A.   Paragraph 1**

Paragraph 1 conveyed to HarperCollins "the exclusive right to publish [Julie of the Wolves] . . . in book form."  Relying heavily on prior precedent from this district, Open Road argues that this language cannot possibly extend to e-book publication rights.  See Random House, Inc. v. Rosetta Books LLC, 150 F. Supp. 2d 613, 620 (S.D.N.Y. 2001); Def. Mem. at 11-15.  However, the operative contract here differs significantly from its counterpart in Rosetta Books, which was held to be limited to paper book publication.  In the instant case, the governing grant conveys the right "to publish . . . in book form," whereas in Rosetta Books, the grant was one "to print, publish and sell."  Id.  As was explicitly argued in the earlier case, the inclusion of the word "print" has a limiting effect and a strong connotation of paper copy.  Id.; Rich Decl. Ex. 46 at 14.  The word "print" is absent from the 1971 contract governing here, thereby distinguishing the case at bar from Rosetta Books.

Nonetheless, given that we must interpret the contract as a whole, we need not reach the issue of whether Paragraph 1 standing alone is sufficient to convey e-book publication rights.  See Int'l Klafter Co. v. Cont'l Cas. Co., 869 F.2d 96,

99 (2d Cir. 1989).  With that precept in mind, we turn next to evaluate Paragraph 20, which, by explicitly granting HarperCollins certain rights associated with use by "electronic means," created a critical distinction from <u>Rosetta Books</u>, whose contract made no mention of electronic exploitation at all.

**B.    Paragraph 20**

Paragraph 20, supported by the grant provision in Paragraph 23, enables HarperCollins to issue licenses, subject to the author's permission, to use the work in "in storage and retrieval and information systems, and/or whether through computer, computer-stored, mechanical or other electronic means now known or hereafter invented."  This language, encompassing as it does the forward-looking reference to technologies "now known or hereafter invented," is sufficiently broad to draw within its ambit e-book publication.  Although no commercial market for e-books existed at the time of its drafting, e-book technology comprises a later-invented version of the very "computer, computer-stored, mechanical or other electronic means" provided by Paragraph 20.

In light of precedent indicating that broad grant language will extend to later-invented uses, e-book publication "may reasonably be said to fall within the medium as described in the license."  <u>Bartsch</u>, 391 F.2d at 155.  Our conclusion that e-books constitute a permissible new use follows both from the

expansive contractual language and from the lens through which the Second Circuit directs us to construe it. The applicable Second Circuit precedent cautions courts not to limit new uses to those that "fall within the unambiguous core meaning of the term" provided by the contract. Id. Rather, the e-book format constitutes a permissible extension of "book form" via "storage and retrieval and information systems, and/or whether through computer, computer-stored, mechanical or other electronic means" just as the television broadcast of a movie and the videocassette constituted a lawful extension of the motion picture form in Bartsch and Boosey, respectively.

When considered in comparison to contracts in similar cases, the contractual language here is as broad as that previously found to be sufficient to encompass a later-developed new use. The Bourne contract conveyed the "right to record such music mechanically in any and all other motion pictures to be produced . . . ." 68 F.3d at 624. In Boosey, the grant language provided rights "to record [the composition] in any manner, medium or form" for use "in [a] motion picture." 145 F.3d at 486. In Bartsch, the contract granted the right "to copyright, vend, license and exhibit such motion picture photoplays throughout the world; together with the further sole and exclusive rights by mechanical and/or electrical means to record, reproduce and transmit sound" -- a conveyance that

appears rather similar in scope to Ms. George's grant to HarperCollins of the "exclusive right to publish [<u>Julie of the Wolves</u>] in book form." 391 F.2d at 151; Contract ¶ 1. Notably, none of the contracts in <u>Bartsch</u>, <u>Bourne</u>, or <u>Boosey</u> included any reference to rights in future technologies that exists in the contract here.

By specifically providing for anticipated electronic means that might be "hereafter invented," the 1971 contract's grant language becomes greater in breadth, at least with respect to new uses, than the analogous contracts in Second Circuit new use precedent, which were themselves found sufficiently broad to encompass an electronic new use. Interpreting similar forward-looking contractual language in a new use context, another court in this district drew the same conclusion. <u>See</u> <u>Reinhardt v. Wal-Mart Stores, Inc.</u>, 547 F.Supp.2d 346, 354-55 (S.D.N.Y. 2008). In <u>Reinhardt</u>, a 1984 recording agreement wherein "records" were defined as "all forms of reproduction including pre-recorded tapes and discs and electronic video recordings, *now or hereafter known*" was construed to authorize later-invented digital and internet-enabled uses. <u>Id.</u> (emphasis added). Relying, as we do here, on the Second Circuit standards set forth in <u>Boosey</u>, the district court in <u>Reinhardt</u> explained that "[t]he phrase 'now or hereafter known,' when referring to forms of reproduction, reveals that future technologies are

covered by the agreement" and that the language "creates an expansive rather than a restrictive conveyance of rights." Id. at 354. The language of Paragraph 20 -- "now known or hereafter invented" -- tracks its analog in Reinhardt rather closely and results in a similarly expansive conveyance of rights with regard to future technologies.

Indeed, apparently recognizing the breadth of the language in Paragraph 20, Open Road's briefing largely ignored it. Instead, Open Road attempted to redirect the Court's attention to Paragraph 1 and to the Rosetta Books precedent, which, as discussed above, did not directly address the issues present here. To the extent that Open Road did grapple with the implications of Paragraph 20, its strategy has been to attempt to rewrite the provision. Specifically, Open Road entreats the Court to disregard the "and/or" language, thereby converting the latter clause from an independent to a dependent one as follows: "in storage and retrieval and information systems, [~~and/or~~] whether through computer, computer-stored, mechanical or other electronic means now known or hereafter invented." Def. Mem. at 4 n.1; Def. Opp. at 8-14. In support of this proposed ex post revision, Open Road argues that the "and/or" is "syntactically awkward," that it constitutes an "unnecessary insertion," that

it would create meaningless surplusage, and that it would lead to an "absurd result."[5] Id.; Boni Decl. Ex. 15 ¶ 4.

Defendant's request to rewrite the contract is at variance with the generally-applied "heavy presumption that a deliberately prepared and executed written instrument manifest[s] the true intention of the parties," and is further unsupported by the "correspondingly high order of evidence [that] is required to overcome that presumption . . . show[ing] in no uncertain terms, not only that mistake or fraud exists, but exactly what was really agreed upon between the parties." Chimart Assocs. v. Paul, 489 N.E.2d 231, 234 (N.Y. 1986) (internal quotations and citations omitted). The case law is clear that "the burden of justifying a departure from the most reasonable reading of the contract should fall on the party advocating the departure." Boosey, 145 F.3d at 488. Notwithstanding its arguments to the contrary, Open Road has failed to carry that burden. Def. Opp. at 8-14. The request is particularly unwarranted in a new use context, where, given the age of the contract at issue, extrinsic evidence is scarce and thus "the parties or assignees of the contract should be entitled to rely on the words of the contract." Id.

---

[5]     Any attempt to characterize the "and/or" language as "unnecessary" is quickly undermined by the very implications of defendant's own argument; if, as Open Road argues, removing "and/or" markedly changes the meaning of the provision, then definitionally it cannot be an "unnecessary insertion."

Also undermining defendant's argument is the plain fact that the language of Paragraph 20 was inserted verbatim into the contract at the request of Ms. George's agent, a circumstance that defendant tries in vain to reconcile with its litigation position.  Pl. Opp. at 8; Def. Opp. at 13-14.  As a matter of neutral contract interpretation, "New York follows the well established <u>contra proferentem</u> principle which requires that equivocal contract provisions are generally to be construed against the drafter."  <u>McCarthy v. Am. Int'l Grp., Inc.</u>, 283 F.3d 121, 124 (2d Cir. 2002).  Here, we need not even resort to the use of <u>contra proferentem</u>, because the "and/or" language is not, in the context of this contract, equivocal.

Finally, it is worth noting that, even if the Court were to adopt Open Road's deletion of the "and/or" conjunctive, it is far from clear that this revision would support Open Road's overall position.  Given the record before us, this Court finds it plausible that Paragraph 20's "storage and retrieval and information systems" could, pursuant to new use precedent, encompass today's e-book technology.  Nevertheless, having found no basis for removing the "and/or" language, we deem it unnecessary to undertake this inquiry or adjudicate the merits of the copious, competing expert material presented on the precise definitional scope of "storage and retrieval and information systems."

## C.  Other Contract-Based Arguments

In addition to the arguments discussed supra, Open Road makes three other arguments involving interpretation of the contractual language, which the Court has considered and found unpersuasive.  First, Open Road submits that Paragraph 20 grants HarperCollins no right to publish an e-book edition of Julie of the Wolves itself, which HarperCollins disputes.  Def. Mem. at 19; Pl. Mem. at 16; Pl. Opp. at 12.  This argument is irrelevant to the inquiry at hand.  The question before us is whether HarperCollins has exclusive rights to license the work's e-book publication, *not* whether HarperCollins may undertake such publication itself.  Even were we to conclude that HarperCollins has no rights to the latter, it would not alter our decision regarding the former.

Secondly, Open Road argues that Paragraph 20 is missing an essential contractual term – to wit, a royalty rate – rendering it unenforceable for lack of the provision of the consideration to be paid under the contract.  Def. Mem. at 20-21.  Once again, Open Road attempts to redirect attention to the question of whether HarperCollins has the right to publish an e-book version of the work, a question not before this Court and not germane to this litigation.  Insofar as Paragraph 20 explicitly includes a royalty provision for third-party licenses by which

HarperCollins and the author evenly divide the net proceeds, this argument is meritless.[6]

Thirdly, Open Road presents the contract's reservation of rights clause in Paragraph 14, which reserves to the author "[a]ll rights in the Work now existing, or which may hereafter come into existence, not specifically herein granted," as evidence that Ms. George did not intend to convey e-book publication rights, arguing that to find otherwise would convert this provision to surplusage. Def. Mem. at 15; Def. Opp. at 14. As the Second Circuit observed in Boosey, the "reservation clause stands for no more than the truism that [the author] retained whatever [s]he had not granted . . . [i]t contributes nothing to the definition of the boundaries of the license." 145 F.3d at 488.

D. **Foreseeability**

Beyond the scope of the contractual language itself, Open Road's primary argument against HarperCollins' copyright claim involves the foreseeability inquiry that has arisen in the new

---

[6]    Relatedly, Open Road also argues that by refusing to pay Ms. George a 50% royalty, HarperCollins materially breached the contract, excusing Ms. George from further performance.  Tr. at 29.  It is conceded that this is not a breach of contract action, and that Ms. George, the individual who could bring such an action, is not a party here.  Similarly, Open Road's argument that the absence of a royalty provision makes the contract unenforceable would seem to be a claim reserved to Ms. George, if anyone.  We do mention parenthetically, however, that the absence of a royalty term does not necessarily complicate the contract's enforceability.  After all, the same contract lacked a royalty rate for the paperback edition, an absence that apparently did not cast doubt upon HarperCollins' paperback publication rights.  Contract ¶ 7(e); Pl. Opp. at 13 n.9.

use precedent. Open Road characterizes the new use standard as requiring "two analytical steps, both of which must be satisfied before the new use will be deemed conveyed:" first, a determination of the breadth of the grant language and second, a determination of the new use's foreseeability. Pl. Mem. at 8-9. The case law itself, however, contains no such explicit bifurcation. Further, the Second Circuit has left open the question of whether foreseeability is, in fact, required. Boosey, 145 F.3d at 486. Although Bartsch, Bourne, and Boosey all evaluate, to some extent, whether the new use was within contemplation at the time of the grant, plaintiff's presentation of Second Circuit law as requiring a separate and specific showing of foreseeability is, at best, an oversimplification and, at worst, a distortion of the explicit language of the relevant precedent.

To the extent that foreseeability at the time of the grant is required to extend a copyright to a new use, however, the language of the contract itself provided for foreseeable uses. The reference to electronic means "now known or hereafter invented" anticipated future technological uses for the work, which would one day include e-books. By this logic, the contract here may be said to fulfill the foreseeability standard, to the extent it exists, even without reference to the record evidence. See, e.g., Reinhardt v. Wal-Mart Stores, Inc.,

25

547 F.Supp.2d 346, 354-55 (S.D.N.Y. 2008) ("The phrase 'now or hereafter known,' when referring to forms of reproduction, reveals that future technologies are covered by the agreement. . . . This unambiguous language [inter alia] forecloses other interpretations and the need to consider extrinsic evidence.").

Even if foreseeability were a requirement not satisfied by the contractual language, the record before us, particularly in the context of the new use precedent, would support our decision. Although no commercial e-book market existed at the time of the grant,[7] knowledgeable industry members seem to have contemplated electronic or computer-assisted delivery of book text in much the same way that knowledgeable members of the motion picture industry could contemplate television broadcasts and videocassettes at the time of contracting in Bartsch, Bourne, and Boosey. Recall too that in those precedential cases, the Circuit did not require that industry participants foresee with specificity actual videocassette technology, for example. Rather, the Courts merely noted that, when the contracts at issue were drafted, industry participants recognized the possibility of a "home viewing" market. Bourne, 68 F.3d at 630; Boosey, 145 F.3d at 486. If videocassettes can

---

[7]    In this regard, we do not necessarily disagree with Open Road's expert, who contends that there could be no "viable market" for e-book publishing until the convergence of five separate technologies, which did not occur until the 1980s. Def. R. 56.1 ¶¶ 41-47. We certainly make no assertion that a "viable market" for e-books existed as of 1971.

be said to have been in contemplation of members of the motion picture industry in the 1930s, it follows _a fortiori_ that the same can be said for e-books at the time of the 1971 contract. Open Road seemed almost to concede as much at oral argument, indicating that industry participants drafted Paragraph 20 and similar clauses elsewhere against the backdrop of contemporaneous university initiatives "digitizing the libraries, putting on electronic databases [of] books." Tr. at 22.

**E.   Remaining Theories**

The parties have raised a number of other arguments, none of which have the capacity to alter the result we have already reached. However, for the sake of completeness, we mention them briefly here.

Both parties argued that the course of performance under the contract favored their positions. Pl. Mem. at 16-17; Def. Opp. at 18-20. While by no means dispositive, the balance probably weighs in favor of HarperCollins here, since it has presented evidence of performance under Paragraph 20 of the contract, and since Open Road's evidence to the contrary suggests that Ms. George's unilateral licensing activities were undertaken without HarperCollins' knowledge or consent, and

hence may have been in breach of contract.[8]  Pl. Mem. at 7-8;
Def. Opp. at 18-20; Tr. at 15; Pl. R. 56.1 ¶¶ 19-23; Rich Decl.
Ex. 13-16.

Open Road also advanced the contention that subsequent
contracts or other agreements should inform the Court's
construction of the operative agreement.  Def. Opp. at 11.  But
just as previous contracts between Ms. George and HarperCollins
that included the controversial "and/or" conjunctive are not
especially relevant here, so too are subsequent contracts that
omitted said language.[9]  Similarly, the parties interpret in
contrary fashion the "All Rights Reserved" clause in Open Road's
e-book version of <u>Julie of the Wolves</u>, which echoes some of the
same language challenged here.  Pl. Mem at 9; Def. Opp. at 20-
21.  Guided by the precedent discussed <u>supra</u>, however, this
Court elects to focus its inquiry on the operative contract
instead of other writings.  The same is true for the
indemnification agreement executed by Open Road at the request
of Ms. George and her agent Curtis Brown, who sought protection
from suit before accepting Open Road's e-book publication offer.

---

[8]     Additionally, Open Road's argument that the parties' course of dealing
regarding prior electronic uses fell under the auspices of Paragraph 19
"permissions" rather than Paragraph 20 "electronic uses" does defendant no
good, for Paragraph 19 gives HarperCollins rights at least as broad as those
provided by Paragraph 20.  <u>See</u> Tr. at 15.  In any event, the Court does not
adopt this belabored interpretation of Paragraph 19, which by its very terms
is limited to reprinting in "a newspaper, magazine, book or anthology," not
in electronic media.  Contract ¶ 19.
[9] It must also be noted that they neatly balance one another out.

Pl. R. 56.1 ¶¶ 35-36; Def. R. 56.1 Ctr. Stmt. ¶¶ 35-36. The agreement itself and Curtis Brown's pre-agreement advice that Open Road secure a license from HarperCollins suggest that Ms. George may have entertained doubts about her retention of the e-book rights. Id. However, without further evidence of Ms. George's state of mind, the indemnification agreement is of limited value. Because of the age of this contract and the death of the principals – including Ms. George who died before being deposed in this action – there is little or no reliable extrinsic evidence of the intent of the parties, outside of the four corners of the writing itself. Pl. R. 56.1 ¶ 40; Def. R. 56.1 ¶ 3. As discussed supra, this situation where extrinsic evidence of intent is "scant and unreliable" is typical for new use cases, and is one of many reasons why "the parties or assignees of the contract should be entitled to rely on the words of the contract." Boosey, 145 F.3d at 488.

Having accordingly relied on the words of the contract, this Court holds that, by its language, the contract grants to HarperCollins the exclusive right to license electronic publications, a right which was infringed by Open Road in its unlicensed e-book publication of Julie of the Wolves. In so holding, the Court is mindful of the marketplace implications here – specifically, assuming HarperCollins itself has no unburdened right to e-book publication, the risk of deadlock

that might, as Open Road puts it, "deprive the marketplace of an e-book version of this children's classic." Def. Mem. at 6, 15 n.3; see also Tr. at 28. We take this concern seriously, but also note that the risk follows directly from the agreed-upon language of Paragraph 20, which explicitly bifurcated licensing rights between the publisher and the author, the latter of which retains a veto. Moreover, as the parties acknowledged at oral argument, this problem is largely historical in scope, because contemporary publication contracts explicitly address e-book publication rights. Tr. at 3-4. Consequently, it is possible that our holding, dependent as it is on antiquated language, may be of limited applicability beyond the confines of this contract and this case.

## VI. Remedies

In their complaint, HarperCollins sought injunctive relief, actual damages or statutory damages enhanced for willful infringement at their election, Open Road's profits pursuant to the requirements of the Copyright Act, and the recovery of HarperCollins' costs and attorney's fees.[10] Compl. ¶ 33. Because these issues and the calculation of damages have not been briefed before this Court, it would be premature to determine remedies at this time. Instead, the Court orders that

---

[10] At oral argument, however, plaintiff appeared to reconsider their claim of willful infringement and their consequent request for enhanced damages. Tr. at 27-28.

the parties submit a briefing schedule by two weeks from the date of this order, or inform the Court by the same date if they prefer to proceed instead by negotiated settlement.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted and defendant's cross-motion is denied. This Memorandum and Order resolves Docket Nos. 16 and 21.

Dated:     New York, New York
           March /4/, 2014

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

## Attorneys for Plaintiff

R. Bruce Rich, Esq.
Mark J. Fiore, Esq.
Sabrina A. Perelman, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153


## Attorneys for Defendants

Michael J. Boni, Esq.
Joanne E. Zack, Esq.
John E. Sindoni, Esq.
Boni & Zack LLC
15 St. Asaphs Road
Bala Cynwyd, PA 19004

Robert J. LaRocca, Esq.
Kohn, Swift & Graf, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107